**META–FILM ASSOCIATES, INC., Plaintiff,**

v.

**MCA, INC., et al., Defendants.**

**META–FILM ASSOCIATES, INC., Plaintiff,**

v.

**21ST CENTURY COMMUNICATIONS, INC., et al., Defendants.**

Nos. CV 79–1272 MRP, CV 79–3811 MRP.

United States District Court, C.D. California.

May 14, 1984.

James P. Tierney, P.C., Santa Monica, Cal., for plaintiff.

Louis P. Petrich, Youngman, Hungate & Leopold, Los Angeles, Cal., for defendants MCA, Universal, ABC, Simmons, Reitman, Ramis, Miller & Stumpf as Executor of the Estate of Douglas Kenney.

Jonathan David Rapore, Los Angeles, Cal., for defendants Yearbook Movie Co., 21st Century Communications, Inc., Nat. Lampoon Inc., National Lampoon Players, Inc., and Ivan Reitman Enterprises, Inc.

## OPINION

PFAELZER, District Judge.

Defendants' motions for partial summary judgment and for orders specifying that certain material facts are without substantial controversy came on for hearing on January 16, 1984. The court, having considered the papers filed and oral arguments made, now files this Opinion, which shall constitute its Findings of Fact and Conclusions of Law.

## I. BACKGROUND

The motion picture "Animal House", a satire on college fraternity life, was filmed in late 1977, from a screenplay developed from a 110 page treatment (the "Treatment"), which was written under the auspices of defendant National Lampoon Incorporated. It was released by defendant Universal City Studios, Inc., ("Universal") to the general public in the summer of 1978. The picture was a commercial success, grossing, according to the plaintiff's complaint, over $60,000,000 in film rentals. The success of Animal House led defendants MCA, Inc. (the parent corporation of Universal) and the American Broadcasting Corporation, Inc. ("ABC") to produce a television series as a sequel to the film. The pilot episode of this television series, which was entitled Delta House, was broadcast on January 28, 1979.

Plaintiff Meta-Film Associates, Inc. is the assignee of the rights in an unpublished screenplay entitled "Frat Rats". Plaintiff, asserting that Animal House and the Delta House television series were copied from Frat Rats, instituted this action in 1979. A First Amended Complaint, filed in February 1980, contains four counts: a first count for federal copyright infringement and unfair competition; a second count for common law copyright infringement; a third count for breach of confidence; and a fourth count for breach of contract. On August 15, 1983, the parties filed a stipulation dismissing, with prejudice, plaintiff's third count for breach of confidence, its fourth count for breach of contract, and all claims in its first count which relate to episodes of the Delta House television series other than the pilot episode.

The defendants then filed an array of motions attacking plaintiff's remaining claims. Two of these motions seek an order specifying, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, that certain material facts are without substantial controversy. First, defendants seek an order that plaintiff has standing to sue for infringement of the Frat Rats copyright only as to the original material contributed by William Kerby and not as to the underlying material written by James Hart. Second, defendants seek an order specifying that the creators of the Treatment had no access to the Frat Rats screenplay prior to submitting the Treatment to Universal. In a third motion, the defendants seek partial

summary judgment as to plaintiff's claim for copyright infringement on the ground that plaintiff did not, as required by § 205(d) of the Copyright Act of 1976, register the assignments by which it obtained rights in the Frat Rats copyright prior to instituting this litigation. In a fourth motion, defendants seek partial summary judgment with respect to plaintiff's claim for unfair competition and common law copyright infringement.[1]

## II. DISCUSSION

### A. *Standing*

Frat Rats is comprised of four separate drafts, which were written between 1975 and 1977. The first draft was completed by James Hart in or about December 1975. The second draft, a rewrite of the first, was completed by Hart on or about April 12, 1976. The third draft, a revision of the preceding two drafts, was prepared by William Kerby and completed in or about March of 1977. The final draft, also prepared by Kerby, was completed in or about May of 1977.

The defendants argue that plaintiff is the assignee of only the rights to the third and fourth drafts (the "Kerby drafts"). They contend that Hart never assigned his rights in the first two drafts (the "Hart drafts") to plaintiff, and, as a consequence, that plaintiff has standing to sue for infringement of the Frat Rats copyright only as to the material added by Kerby. In reply, plaintiff asserts that it acquired its rights to Frat Rats through *two* assignments from James Hart. The rights to the Kerby drafts were initially held by Hart, who acquired them through a "Loanout Agreement", dated December 29, 1976, between Hart and "The New Glory", Kerby's loanout company. In an "Assignment and Assumption Agreement" dated June 24, 1977,

Hart transferred his rights in the Kerby drafts to plaintiff.

Defendants do not contest the validity of the assignment to plaintiff of the rights to the Kerby drafts; rather, as stated, they challenge the plaintiff's rights in the Hart drafts. At the time they filed this motion, defendants had never been provided with a signed copy of an assignment to plaintiff of the rights in the Hart drafts. However, in an exhibit attached to its December 22, 1983 memorandum in opposition to this motion, plaintiff, for the first time, provided an executed copy of an assignment ("the Hart assignment") dated June 24, 1977, in which Hart appears to have assigned all his rights in Frat Rats to plaintiff. Based on this assignment of the rights in the Hart drafts, defendants' motion on this ground must be denied at this time.

Defendants question the authenticity of the Hart assignment and request an extension of the discovery cut-off date to allow them to conduct discovery with respect to this particular document. Although plaintiff's explanation for its failure to provide defendants with an executed copy of the Hart assignment earlier in these proceedings appears reasonable, the court finds it appropriate to grant defendants' request. Therefore, the court will allow defendants to conduct discovery for the sole purpose of testing the authenticity of the Hart assignment. If, in the course of this discovery, defendants ascertain facts which call into question the validity of the Hart assignment, they may renew this motion challenging plaintiff's standing.

### B. *Recordation Requirement*

Paragraph 9 of the first amended complaint states, in part, that "plaintiff has complied in all respects with the copyright laws of the United States ..." In this motion, defendants attack this allegation. They contend that plaintiff's failure to

---

1. In a fifth motion, defendants seek partial summary judgment as to plaintiff's claim that the pilot episode of the Delta House television series infringes plaintiff's copyrights. Finally, in a sixth motion, defendant ABC seeks partial summary judgment as to plaintiff's claim that ABC is liable for federal and common law copyright infringement. Plaintiff did not oppose the latter two motions, and in an order filed concurrently with this Opinion, the court granted defendants' fifth and sixth motions.

record the assignment from Hart to it of the rights to the Kerby drafts (i.e., the third and fourth drafts) prior to commencing this litigation violates the recordation requirement of Section 205(d) of the Copyright Act of 1976. As a consequence, defendants argue, this court lacks jurisdiction over plaintiff's copyright claim concerning the Kerby drafts. Plaintiff asserts that the copyright laws do not require such a recordation, and, in any event, that its subsequent recordation of the assignment cures any defect that may have existed. Since plaintiff's second argument is dispositive of this motion, the court finds it unnecessary to address plaintiff's first argument.

■ The second argument turns on the construction of 17 U.S.C. § 205(d), which provides that,

> [no] person claiming by virtue of a transfer to be the owner of copyright or of any exclusive right under a copyright is entitled to institute an infringement action under this title until the instrument of transfer under which such person claims has been recorded in the Copyright Office, but suit may be instituted after such recordation on a cause of action that arose before recordation.

As noted above, plaintiff acquired its rights to the Frat Rats screenplay through two written assignments from James Hart. Plaintiff, however, did not file either assignment with the Copyright Office prior to instituting this litigation; in fact, plaintiff did not do so until December 22, 1983, after having been served with this motion. Therefore, the question is whether this late filing deprives the court of jurisdiction. The court is persuaded that it does not.

The literal language of § 205(d) does suggest that recordation is a condition precedent to institution of suit. However, the courts have not strictly construed the filing requirements of the Copyright Act. In *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir.1970), the Ninth

Circuit refused to interpret another of the Copyright Act's registration requirements as depriving the court of jurisdiction. The section involved in that case was § 13 of the Copyright Act of 1909, 17 U.S.C. § 13,[2] which provided that "no action or proceeding shall be maintained for infringement ... until the provision of this title with respect to the ... registration of such work shall have been complied with." The Ninth Circuit stated that, even if the term "maintained" meant "begun", the plaintiff's failure to register his work before filing suit was not fatal to the action; the court held that since the pretrial conference order was filed after the registration of plaintiff's work, and since the order, by its terms, "supplement[ed] the pleadings", *id.* at 1109, no bar to federal court jurisdiction existed. In *Co-Opportunities v. National Broadcasting Co.*, 510 F.Supp. 43 (N.D. Cal.1981), the court extended *Roth's* liberality towards late filing to § 205(d). In that case, prior to filing the action, the plaintiff recorded a "Notice of Assignment" with the Copyright Office. After instituting the litigation, the plaintiff discovered that this action might prove insufficient to comply with § 205(d)'s requirement that an assignee record "the *instrument* of transfer". The plaintiff then filed the assignment itself with the Copyright Office. In evaluating whether § 205(d) barred the plaintiff's action, the district court stated that, assuming that the plaintiff's initial recordation of the Notice was deficient, it was presented with the question of "what effect recordation has on a previously instituted action." *Id.* at 48. After surveying the case law, including *Roth*, the court held that "the subsequent recordation will be allowed to relate back so that the assignee acquires a right to sue as of the date of filing of the action." *Id.* at 49.

The court agrees with the district court in *Co-Opportunities* that *Roth's* analysis applies with equal force to § 205(d). The court also believes that such a rule pro-

---

**2.** The registration provisions of the current copyright act, contained in 17 U.S.C. § 411, are similar to those of the 1909 Act.

motes efficiency and equity. Therefore, by filing the two agreements with the Copyright Office on December 22, 1983, plaintiff has cured its initial failure to record the assignments; the recordation will be held to relate back to the filing of this action.[3] As a consequence, § 205(d) does not deprive the court of jurisdiction over plaintiff's copyright claims.

### C. Access

Plaintiffs contend that the creators of the Animal House treatment had access to Frat Rats before completing the Treatment through several channels. Defendants assert that there is no reasonable possibility that the Treatment's authors had an opportunity to view or copy Frat Rats and have moved this court for an order, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, that, as a matter of law, the creators of the Treatment had no access to Frat Rats.

Plaintiffs assert that one manner by which the creators of Animal House gained knowledge of Frat Rats was through a chain of transmittals commencing with the submission of the Frat Rats screenplay to John Badham in 1975. Badham, a motion picture director, was, in late 1975, under contract with Universal to perform directing services in connection with the film "Bingo Long and the Traveling All Stars" ("Bingo Long"). Badham finished the filming of Bingo Long, which took place on location in Georgia, in or around August 1975. At that time, he returned to Universal, where his office was then located. For the following ten months, he rendered postproduction services relating to the film.

On December 17, 1975, Chase Mellon, an attorney representing James Hart, the author of Frat Rats, submitted a copy of Frat Rats to Badham. Badham states that he is sure that Mellon submitted Frat Rats to him to see if he was interested in directing it and that the submission was directed to him personally rather than to Universal. Mellon's view of the submission is consistent with Badham's. At his deposition, Mellon stated, with respect to the Frat Rats submission, that "I called John, told him I would like to send it to him. I *believe* he had offices at Universal at the time. I'm not sure." (Emphasis added.) There is no evidence to contradict the testimony that Frat Rats was submitted to Badham personally and not to Universal. Badham states that, after reading Frat Rats, he concluded that "it was a terrible piece of material ..." He further states that he did not show the Frat Rats script to anyone and that he has no recollection of talking about the script to any executive at Universal.

Badham states that, when a script is submitted to him, his normal procedure is to read it and then to return it to the script's source. Badham maintains a card file containing index cards recording all scripts submitted to him. Badham's file index contains a card labelled Frat Rats, which indicates that the script was returned to Chase Mellon on January 8, 1976. Although his customary practice was to enclose a cover letter along with the returned script, and although he normally retains a copy of such letter, Badham was unable to locate a copy of the letter which normally would have accompanied the return of the Frat Rats script. Badham has no recollection, other than that derived

---

**3.** The Court believes, as the *Co-Opportunities* court apparently did, that a supplemental pleading is unnecessary to comply with § 205(d). As discussed in the text, the court in *Roth* adopted the fiction that an action is instituted when a pleading is supplemented. In the instant case, the court, by relating the recordation of the assignment back to a time preceding the institution of this action, embraces an alternative fiction. Since a supplemental pleading, if necessary to promote justice, would relate back to the filing of the initial complaint, *see Security Insurance Co. v. U.S. ex rel. Haydis,* 338 F.2d 444 (9th Cir.1964), the fictions adopted by this court and by the Ninth Circuit in *Roth* are identical in effect. Under the fiction adopted here, the complaint's allegation that plaintiff has "complied in all respects with the copyright laws of the United States" is valid; therefore, the court considers it superfluous, inconvenient and formalistic to require plaintiff to file a supplemental or amended complaint, identical to that already filed, simply to adhere to *Roth's* fiction.

from the index card, of returning the script to Mellon.

During Bingo Long's post-production period, Badham met with Universal executives Ned Tanen, who had brought Bingo Long to Universal and supervised it through completion, Thomas Mount, Tanen's assistant, and Verna Fields, as well as with various other people supervising the post-production and editorial departments of Universal. These individuals provided Badham with comments and criticism regarding his editing of Bingo Long. Some of these meetings took place in Badham's office. Badham states that at none of these meetings did he ever discuss Frat Rats with the Universal people.

While Badham was doing post-production work on Bingo Long, the Animal House treatment was being developed. The Treatment was written in New York City by Douglas Kenney, Chris Miller and Harold Ramis under the auspices of the National Lampoon Company. Although the initial outline was a parody of high school life, after a meeting with Matty Simmons and Ivan Reitman, who ultimately produced the movie, it was agreed to develop a motion picture about colleges and fraternity life. The completed Treatment was submitted to Matty Simmons in early March 1976, and personally delivered to Gerald Miller, the Director of Universal's Independent Film Acquisition department, on or around March 17, 1976.[4] Miller read the Treatment that day and gave a favorable report of it to Ned Tanen, the executive to whom he had reported previously about Animal House. Approximately two days later, Simmons and Reitman met with Miller and Ned Tanen in Tanen's office to discuss the "deal" that ultimately brought Animal House to Universal.

Representatives of Universal and National Lampoon had contacts with one another regarding Animal House prior to the Treatment's submission to the studio in March 1976. These contacts were limited to communications between Gerald Miller ("Miller") of Universal and Matty Simmons ("Simmons") and Douglas Kenney ("Kenney") of National Lampoon. The contacts began on December 9, 1975 when Miller read an article in Variety announcing that National Lampoon intended to produce a film. On that date, Miller wrote Kenney a letter that referred to the announcement and expressed Universal's interest in the project. On December 16, 1975, Simmons

---

**4.** Plaintiff contends that the completion date of the Treatment is a material fact that should not be resolved on a motion for summary judgment. The court disagrees. In his deposition, Gerald Miller stated that Matty Simmons and Ivan Reitman delivered a copy of the Treatment to him on March 17 or March 18, 1976 at the Beverly Hills Hotel. This evidence concerning the Treatment's completion is corroborated by the deposition testimony of several other individuals. Jay Emmet, an executive at Warner Communications, stated that he received a copy of the Animal House Treatment on or around March 17, 1976. Doris Gilbert, a reader at Warner Brothers, identified a synopsis and analysis dated March 22, 1976 that she had prepared on the Treatment. In suggesting that a material issue of fact exists concerning the Treatment's completion date, plaintiff relies on the deposition testimony of Ivan Reitman, in which Reitman stated that the Treatment's authors did not begin writing a screenplay about college life until some time in or after February or March 1976, and that the Treatment was not completed for another two to three months. However, in the sentence preceding this statement, Reitman asserted that his recollection of these dates was "only a guess", and at a later point in the deposition, he stated that his earlier testimony regarding the work on the Treatment "were guesses in terms of exact months." Moreover, this guess is inconsistent with his assertion that he delivered the completed Treatment to Gerald Miller "sometime in the very early spring." In light of the overwhelming evidence pointing to a completion date of March 1976, the court does not believe that Reitman's "guess" is sufficient to raise a genuine issue of material fact on this question.

In any event, even if, as plaintiff contends, the Treatment might not have been completed until May or June 1976, the court's ruling on this motion would not be affected. As discussed in the text, *infra*, each of the submissions of Frat Rats to individuals connected in some manner with Animal House, (that is, to Fields, Matheson, and MacGregor-Scott) occurred after June 1976. Therefore, a finding that the Treatment was completed in June 1976 would not disturb the court's finding, as a matter of law, that the creators of Animal House did not gain access to Frat Rats until some time following the Treatment's completion date.

telephoned Miller in response to Miller's December 9 letter. In this conversation, Simmons outlined the Treatment under development. Later that day, Miller wrote Simmons confirming his interest in seeing the Treatment. In or around early February 1976, Miller met with Simmons in New York, at which time they discussed the Treatment's progress. Miller next met with Simmons, during the week of March 17, 1976, at the Beverly Hills Hotel. At this meeting, Simmons, accompanied by Reitman, delivered a copy of the Treatment to Miller. Miller states that in none of his communications with Simmons, did he suggest any character or story elements for the Treatment. Miller further states that, to his knowledge, he was the only representative of Universal who had any contact with Reitman, Simmons, Kenney, Ramis or Miller prior to the time that he received the Treatment in March 1976.

The writers and creators of the Treatment disclaim any knowledge of Frat Rats prior to the completion of the Treatment. In their respective declarations, Harold Ramis and Chris Miller, the two living authors of the Treatment, state that they "have never read or seen a copy of a screenplay entitled Frat Rats." Reitman states that he has never read a screenplay entitled Frat Rats, nor has he been present when the screenplay was discussed. Simmons asserts that he first became aware of Frat Rats when this suit was instituted in 1979.

In addition to the Badham submission, plaintiff suggests alternative modes by which the creators of the Treatment might have gained access to Frat Rats before submitting the Treatment to Universal. These include submissions to Tim Matheson, an actor who appeared in Animal House, to Peter MacGregor-Scott, the Production Manager of Animal House, and to Universal executive Verna Fields.

The submission to Matheson occurred at a dinner at Mr. Chow's restaurant attended by Matheson, Hart and his wife, and actress Karen Lamm. Although Hart stated that the dinner took place in 1976, other evidence clearly indicates that the dinner in fact took place in early 1977. First, Matheson states that the submission took place in about February 1977. Lamm also expressed her belief that the dinner took place in 1977. Most significantly, when Hart was asked during his deposition when in 1976 the dinner occurred, he replied that "[i]t would have been during the principal photography of High School." [High School, distributed and produced by Universal, was released under the title Almost Summer.] In her deposition, Lamm also stated that the dinner took place during the filming of Almost Summer. Records introduced by the defendant demonstrate that the principal photography of Almost Summer commenced on January 17, 1977 and was completed on March 2, 1977. Thus, there is no dispute that the dinner at Mr. Chow's occurred during the principal photography of Almost Summer and that this photography took place in the early months of 1977. Therefore, despite Hart's unfounded· assertion to the contrary, it is clear that the evidence is uncontroverted that the submission to Matheson occurred in 1977.

Plaintiff also suggests that another channel by which defendant obtained access to Frat Rats was through Peter MacGregor-Scott. MacGregor-Scott gained access to Frat Rats between October and December 1976, when Hart gave him a copy of the screenplay. Finally, plaintiff states that a submission of Frat Rats was made to Verna Fields. This submission took place in March 1977, when Hart and Michael Viner personally delivered a version of Frat Rats to Fields.

■ In order to establish copyright infringement, a plaintiff must prove his ownership of the copyright and "copying" by the defendant or the person who composed the defendant's work. *See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977); 3 *Nimmer on Copyright* § 13.01 (1983). Since, in the usual case, it is not possible to prove copying directly, the plaintiff generally establishes this element

circumstantially, by demonstrating that the person who composed the defendant's work had access to the copyrighted material and that there is substantial similarity between the two works. *Sid & Marty Krofft Television Productions, Inc.*, 562 F.2d at 1162. Once the plaintiff has made this showing, the burden shifts to the defendant to prove that his work was not a copy, but rather was an independent creation. *See Kamar International, Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir.1981). Even without proof of access, a plaintiff can still prove copying if he can show that the two works are not only substantially similar, but are so strikingly similar as to preclude the possibility of independent creation. *See 3 Nimmer on Copyright* § 13.-01[B]; *Ferguson v. National Broadcasting Company, Inc.*, 584 F.2d 111, 113 (5th Cir.1978). Thus, whether or not a plaintiff proves access determines the degree of similarity that he must demonstrate between the two works.

■ Access is proven when the plaintiff shows that the defendant had an "opportunity to view or to copy" the plaintiff's work. *See Sid & Marty Krofft Television Productions, Inc.*, 562 F.2d at 1172. In order to satisfy this standard, a plaintiff must show more than that the defendant had a "bare possibility" of access, *Jason v. Fonda*, 526 F.Supp. 774 (C.D.Cal.1981), *incorporated by reference*, 698 F.2d 966 (9th Cir.1982); instead, the plaintiff must demonstrate that the defendant had a "reasonable possibility" to view the plaintiff's work, *see 3 Nimmer on Copyright* § 13.-02[A] n. 5.

In attempting to establish that the writers of the Treatment had a reasonable opportunity to view Frat Rats as a result of the Badham submission, plaintiff constructs a tortious chain of hypothetical transmittals. Plaintiff speculates that the chain proceeded as follows: (1) Chase Mellon submitted the Frat Rats screenplay to Badham; (2) (a) Badham delivered or described it to a Universal executive—most likely Ned Tanen—with whom he worked during the post-production period of Bingo Long; or (b) one of these executives, while in Badham's office to discuss Bingo Long, saw Frat Rats on Badham's desk and read it [5]; (3) Ned Tanen described Frat Rats to his assistant, Gerald Miller; (4) Miller then passed along this information to Matty Simmons during one of their conversations; and finally (5) Simmons provided this information to the writers of the treatment, Chris Miller, Doug Kenney and Harold Ramis. Plaintiff offers this hypothetical scenario in spite of the fact that it is not supported by a shred of evidence, that Badham had no connection with the Treatment, that Badham states that he never discussed Frat Rats with anyone at Universal, that Miller states that he provided no suggestions or ideas with respect to the Treatment and that Simmons and Reitman denied having read Frat Rats or having heard it discussed before delivering the Treatment to Universal in March 1976. This type of speculation is insufficient to avoid summary judgment on the question of access.

Although each case involving the question of access presents its own set of unique facts, a review of the cases in this area of the law supports the conclusion that plaintiff's proof on this issue is inadequate as a matter of law. The cases upon which plaintiff relies are all distinguishable from the instant case because in those cases, the nexus between the defendant and the individual possessing knowledge of the plaintiff's work was sufficiently strong to raise a reasonable possibility of access by the defendant to the plaintiff's work. The "intermediary", the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility

---

**5.** Plaintiff also suggests, in the alternative, that Badham's secretary may have read Frat Rats. Apparently, plaintiff deems this significant because Badham's secretary might have discussed Frat Rats with a Universal employee who might then have transmitted this information to one of the creators of Animal House. The court does not believe that such a speculative chain approaches the level of possibility needed to establish access.

for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work.

In a number of cases, courts have found access when the alleged infringer and the intermediary occupy positions such that it is natural that information possessed by one would be imparted to the other. For example, in *Bevan v. Columbia Broadcasting System, Inc.*, 329 F.Supp. 601 (S.D.N.Y.1971), the plaintiffs mailed a "presentation" of a proposed television series entitled Stalag 17 to James Aubrey, the president of CBS. Soon after they did so, CBS developed the television series Hogan's Heroes, which plaintiffs alleged infringed their work. During the development of this series, Aubrey attended a series of pre-production conferences, at which the writers and developers of Hogan's Heroes were present. Thus, an executive with responsibility for the allegedly infringing work not only had an opportunity to view the plaintiffs' work, but also participated in meetings regarding the defendant's work in which he could have provided creative comments or suggestions. Given the nature of the relationship between the intermediary and the purported copier and the nature of their contacts, the "bare denials of knowledge" by the writers and developers of Hogan's Heroes were insufficient to take the access question from the jury. *Id.* at 610.

Similarly, in *Smith v. Little, Brown & Company*, 245 F.Supp. 451 (S.D.N.Y.1965), aff'd, 360 F.2d 928 (2d Cir.1966), the relationship between the individual who had viewed the plaintiff's work and the creator of the alleged infringing work was sufficiently close to justify a finding of access. In that case, the plaintiff had submitted a manuscript to the manager of defendant's New York office in April 1957, who then forwarded it to defendant's Boston office. The managing editor of the Boston office read the manuscript, and, in a memorandum written in May 1957, expressed his opinion that the idea was good but that the writing was dull. *Id.* at 453. Plaintiff's manuscript was then sent to a ghost writer, who expressed no interest in revising it. Defendant then returned the manuscript to the plaintiff along with an expression of regret that it could not accept it for publication. In 1960, defendant entered into a contract with Edith Meyer to write a book on the same subject as plaintiff's work. Thereafter, on several occasions, Helen Jones, the editor of the Juvenile Department at defendant's Boston office met with Mrs. Meyer to "to go over her manuscript with her." *Id.* at 454. Mrs. Meyer testified that she had never seen the plaintiff's manuscript or a summary of it, and that Miss Jones did not suggest the title, character or plot of her book. Miss Jones testified that she also had never seen plaintiff's manuscript. However, Mrs. Meyer testified that Mrs. Jones had on one occasion made a "casual" reference to plaintiff's work to her. After trial, the court held that this evidence established access. As in *Bevan*, the evidence established a nexus between the individual with knowledge of the plaintiff's work and the alleged copier. The close relationship between the defendant's two employees—the managing and juvenile editors—the supervisory capacity of the one with knowledge of the plaintiff's work, the virtual equivalence of subject matter between the editors' respective projects, and the knowledge by Miss Jones of the plaintiff's manuscript rendered the inference that the managing editor imparted his knowledge to Miss Jones reasonable. The final inference required, that Miss Jones transmitted information concerning the plaintiff's work to Mrs. Meyer is also reasonable given that the two had extensive contacts prior to the completion of the latter's book. Since, as discussed above, access is defined as a reasonable opportunity to gain knowledge of the plaintiff's work, the court's finding of access was clearly supported by the evidence.

In *Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675 (1st Cir.1967), the plaintiff, a copyright owner of a set of rules for a sales promotional contest, mailed his rules to the defendant corporation. After the defendant conducted a contest similar to

the plaintiff's proposal, the plaintiff brought an infringement action. In support of its summary judgment motion, the defendant introduced affidavits from its employees responsible for the contest, denying knowledge of plaintiff's rules. The First Circuit held that the district court erred in finding, on these facts, that the defendant did not have access to plaintiff's material as a matter of law. The court stated that the plaintiff's act of mailing the rules to the defendant's principal office created "an inference that the letter reached its proper destination." *Id.* at 677. Furthermore, it is reasonable to infer that once it reached defendant's principal office, the letter was delivered to the division responsible for promotional contests. If defendant's policy was to the contrary, it was free to introduce that fact into the record, which it failed to do. *Cf. Vantage Point, Inc. v. Parker Brothers, Inc.*, 529 F.Supp. 1204 (E.D.N.Y.1981) (Plaintiff mailed a description of his copyrighted game to defendant's president. Although receipt by the president would have been sufficient to avoid summary judgment on the question of access, since the plaintiff had a company policy of insulating persons involved in game development from unsolicited submissions and since the president's affidavit explained that the submission was not brought to his attention, "precisely in accordance with the company's policy", *id.* at 1212, there was no basis for finding access. Defendant was therefore entitled to summary judgment.) Since the plaintiff had introduced evidence justifying the inference that the specific unit responsible for contests had received a copy of his rules, summary judgment was inappropriate on the question of access.

In each of these cases, an individual in a position to provide suggestions or comments with respect to the defendant's work—a supervisory employee or an employee within the unit from which the defendant's work was developed—had the opportunity to view the plaintiff's work. In the instant case, in contrast, Badham occupied no such position. He was not an executive overseeing the development of the studio's films. He did not work in a unit with Universal employees who were working on films other than the one which he was directing. Moreover, he had no interest in transmitting information to other Universal employees or executives regarding films that he was not interested in directing. Badham's sole connection with Universal was that he was under contract to the studio with respect to other projects and that he had an office on the Universal lot.

■ Given the attenuated link between Badham and the creators of the Treatment, the court is presented with the question of whether the receipt of a plaintiff's work by an individual who is under contract to a corporation necessarily precludes a grant of summary judgment to the corporation on the question of access. This court is of the view that where, as here, there is little, if any, nexus between the individual who possesses knowledge of a plaintiff's work and the creator of the allegedly infringing work, and where the defendant presents uncontroverted evidence negating transmission of the plaintiff's work (any part of which, if true, would refute plaintiff's case), the plaintiff must show something more than that he sent his work to a director who was under contract to the defendant and had an office on the defendant's lot. The cases cited by the plaintiff do not conflict with this view. As discussed above, the key feature present in these cases was the close relationship linking the intermediary and the alleged copier, which in each case went far beyond the simple fact that they shared a common employer. The soundness of this position is counseled by the realities of the business in which both plaintiff and defendants were engaged. In such a business, countless unsolicited scripts are submitted to numbers of individuals on studio lots every day. Under these circumstances, it is clearly unreasonable to attribute the knowledge of any one individual—especially a non-employee—to every other individual just because they occupy offices on the same studio lot. To the extent that any case sug-

gests a contrary result—that is, that "bare corporate receipt" is sufficient as a matter of law to preclude a finding of non-access, *see Bevan*, 329 F.Supp. at 609–610—the court rejects such reasoning.[6]

Once Badham's capacity as an individual under contract to Universal is rejected as a sufficient basis for establishing access by all other Universal employees, plaintiff must rely on the fact that Badham had contacts with certain Universal executives who were involved in Animal House. It is true that under certain circumstances, courts have drawn an inference of access in situations when the individual with knowledge of plaintiff's work and the defendant are not part of a business enterprise, but rather have dealings with one another. Thus, plaintiff argues that even if Badham's relationship with Universal is insufficient to avoid summary judgment on the access question, the fact that he had direct contacts with Ned Tanen, the Universal executive responsible for Animal House, is sufficient to avoid summary judgment. As discussed below, this argument must also fail.

In aid of its argument that Badham's dealings with Tanen support a finding of access, plaintiff cites *Kamar International, Inc. v. Russ Berrie and Co.*, 657 F.2d 1059 (9th Cir.1981). In *Kamar*, the plaintiffs designed stuffed toy animals and had them manufactured by Korean contractors. Defendants, which, unlike plaintiff, did not independently design its products, later purchased stuffed toy animals from these same manufacturers. Plaintiff alleged that these animals were copies of its design. The Ninth Circuit stated that " 'evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant ...' *Nimmer on Copyright*, § 13.02[A] at 13–11 (1981)." *Id.* at 1062. Finding this

standard satisfied, the court held that the district court's finding that the plaintiff had not proven access was erroneous.

*Kamar* is distinguishable from the instant case in two crucial respects. First, in *Kamar*, the Korean manufacturers that had access to the plaintiff's copyrighted work provided creative suggestions and ideas with respect to the stuffed animals purchased by the defendant. Second, the dealings between the three entities (plaintiff, defendants and manufacturers) in that case related to the identical subject matter—stuffed toy animals. In the instant case, in contrast, neither Badham nor Tannen nor Miller claims to have made any creative contribution to Animal House. With respect to the second element, overlapping subject matter, Badham's contacts with Tanen involved Bingo Long, and had nothing to do with either Animal House or Frat Rats. In this court's view, at a minimum, the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access. *Cf. Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 989 n. 7 (S.D.N.Y. 1980) (Factually similar to *Kamar*. Dealings between plaintiff toy company and the third party, a Taiwanese toy manufacturer, and between defendant toy company and the third party related to stuffed toy gorillas. Held: defendant's access established); *De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir.1944), *cert. denied*, 325 U.S. 862, 65 S.Ct. 1198, 89 L.Ed. 1983 (1945) (plaintiff submitted screenplay to an agent, who thereafter was consulted by defendant as to research details of defendant's work. Held: defendant's access established); *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111 (5th Cir.1978) (dealings between composer and Broadcast Music Incorporated ("BMI") on an *unrelated* sub-

---

**6.** Moreover, even if, contrary to the view of this court, "bare corporate receipt" is sufficient to establish access, the court does not believe that a different result is warranted here. As discussed above, Badham was on contract with Universal to provide directing services and the submission of Frat Rats was to him in his individual capacity, rather than as an employee of Universal. Given this fact, the submission to Badham does not even rise to the level of bare corporate receipt by Universal.

ject are insufficient to establish access by the composer to a composition previously submitted to BMI).[7] Viewed in this manner, the contacts between Badham and Tanen, which related solely to Bingo Long, are insufficient to establish access.

■ The case presenting the most closely analogous factual situation to that of the instant case is *Ferguson v. National Broadcasting Co., Inc.* In *Ferguson,* the plaintiff had composed a musical composition and sent a copy to various individuals and entities, including BMI. BMI showed no interest in plaintiff's work and returned it to plaintiff. BMI then had certain contacts with John Williams, a noted composer and musician. Subsequently, Williams composed a piece of music which plaintiff alleged was a copy of her work. Williams denied having heard of the plaintiff and her composition prior to the institution of the litigation. The district court granted the defendant's motion for summary judgment and the Fifth Circuit affirmed. The Fifth Circuit stated:

> To find that Williams had access, we would have to assume that (1) although BMI professed no interest in plaintiff's composition and returned the original to her, it made and kept a copy which it later allowed Williams to see, and (2) Williams was lying when he said he had never heard of the plaintiff's composition. Plaintiff has given us no reason to believe that either of these assumptions is true, and certainly they are not obviously compelling. Thus, a finding of access in this case would be based on speculation or conjecture, and this is impermissible.

**7.** Thus, it is evident that although the quotation from Nimmer cited in the previous paragraph is broad, the cases on which he relies—*Kamar, Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.* and *De Acosta*—all presented situations in which the dealings between the plaintiff and the third party and between the defendant and the third party involved overlapping subject matter.

**8.** Publication is defined as follows:

*Id.* at 113. As in *Ferguson,* plaintiff's submission to Badham, as a matter of law, cannot sustain a finding of access.

■ Access via the submissions to Matheson, MacGregor-Scott, and Fields likewise presents a material fact without substantial controversy. As discussed above, each of these submissions occurred well after March 1976, the date Universal received the completed Treatment. Therefore, as a matter of law, these submissions did not give the creators of the Treatment access to Frat Rats prior to the Treatment's completion.

### D. Common Law Copyright

Defendants argue that plaintiff's common law copyright claim is preempted by the Copyright Act of 1976 ("the Act"). This argument is premised on defendants' contention that a cause of action for copyright infringement does not arise until the allegedly infringing work is exhibited to the public. Animal House was not released until the summer of 1978. Defendants contend that, since this date was subsequent to the effective date of the Act, the Act preempts any common law copyright claims that plaintiff might otherwise have possessed. While this argument is superficially appealing, the court cannot accept defendants' view of the law on the point.

Prior to the advent of the Copyright Act of 1976, a dichotomy existed in American copyright law between published and unpublished works.[8] Unpublished works were protected by the state law of common law copyright. This protection began at the moment of creation and terminated upon publication, when common law copyright was lost. *See, e.g.,* 1 *Nimmer on Copyright* § 2.02 at 2–16 (1983). Thereaft-

> publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur.

*American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1027 (9th Cir.1981) (quoting 1 *Nimmer on Copyright* § 4.04 at 4–18—4–19).

er, protection was available, if at all, only through federal or "statutory" copyright. *Id.* The Act, which became effective on January 1, 1978, eliminated this dichotomy. Under the Act, almost all works become exclusively the subject of statutory copyright, irrespective of whether they are published or unpublished. *Id.* § 1.01[B] at 1–8. Common law copyright for such works is preempted. *See* 17 U.S.C. § 301(a).

The Act does not preempt common law copyright claims if the claims arose from "undertakings commenced before January 1, 1978." 17 U.S.C. § 301(b)(2). The Act therefore preserves state law causes of action that arose prior to the effective date of the Act. *See Mention v. Gessell,* 714 F.2d 87, 90 (9th Cir.1983); 1 *Nimmer on Copyright* § 1.01[B] at 1–27—1–28. Thus, in the instant case, plaintiff may pursue its common law copyright claim as long as this claim arose prior to 1978.

In order to recover for common law copyright infringement in California, a plaintiff must establish three elements: "(1) ownership by the plaintiff of a protectible property interest; (2) unauthorized copying of the material by the defendant; and (3) damage resulting from the copying." *Golding v. R.K.O. Pictures, Inc.,* 35 Cal.2d 690, 694, 221 P.2d 95 (1950). As stated, defendants argue that, when a work is copied in connection with the production of a motion picture, no legally cognizable damage is sustained by the one whose work is copied until the infringing film is exhibited to the public. They therefore contend that since Animal House was not exhibited until July of 1978, no cause of action arose prior to the effective date of the Act; as a consequence, defendants assert that plaintiff's common law copyright claim is preempted. This argument fails because, contrary to defendants' contention, a cause of action for common law copyright may arise prior to the exhibition of a motion picture to the public.

Defendants' argument is derived from statements in several cases to the effect that the respective plaintiff's cause of action did not arise until the motion picture was exhibited. For example, in *Cain v. Universal Pictures Co., Inc.,* 47 F.Supp. 1013, 1017–18 (S.D.Cal.1942), the court stated that the wrong done to the plaintiff "consists of (1) the deliberate appropriation of a portion of his work and its delivery to others for (2) inclusion in the finished picture and (3) exhibition to the public." However, these cases do not support the broad proposition for which defendants invoke them. In each case cited by defendants, the plaintiff suffered no actual injury until the defendant exhibited his work. In *Cain,* the plaintiff, a well-known writer, alleged that the defendant's motion picture, "When Tomorrow Comes," infringed a novel that he had written and copyrighted. The plaintiff did not allege that he had incurred damages prior to the release of the film; moreover, it is difficult to envision how he could have suffered any such damage under the circumstances. Thus, as the court stated, *"[i]n a case of this character* [,] ... the mere copying of [plaintiff's] material, ... without publication or incorporation into a motion picture, would result in no injury to him." *Id.* at 1017 (emphasis added). *See also Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1375 (5th Cir.1981) (Plaintiff suffered no actual damages prior to exhibition. Court states that the "ultimate test of infringement was the film as broadcast" rather than the underlying scripts.); *Davis v. United Artists, Inc.,* 547 F.Supp. 722 (S.D.N.Y.1982) (same).

The instant case, in contrast, is of a different character than *Cain, Miller* and *Davis.* Here, plaintiff alleges that, because widespread knowledge within the motion picture industry existed by the summer of 1977 that Universal was producing Animal House, potential producers and financiers concluded that a film based on Frat Rats was a bad risk and refused to get involved with it. If proven, this would establish pecuniary injury to plaintiff *prior* to the release of Animal House. Therefore, under the test set forth in *Golding,* plaintiff's allegation states a common law

copyright claim based on defendants' copying of Animal House which arose prior to the film's release. Plaintiff has filed a declaration from Martin Poll, a producer and financier of motion pictures. In this declaration, Poll asserts that, while he "liked the script very much," he deferred a possible investment in Frat Rats until after the release of Animal House. He further states that, after viewing Animal House and finding "numerous similarities between the two works," he decided to forego an investment in Frat Rats. This declaration furnishes evidentiary support for plaintiff's allegation. Therefore, defendants' motion for partial summary judgment with respect to plaintiff's common law copyright infringement claim must be denied.

### E. Unfair Competition

Plaintiff's first count includes a pendent claim for unfair competition. In the complaint, in discovery and in briefs submitted with respect to this motion, plaintiff has identified three actions on the part of defendants which provide the bases of its unfair competition claim. These are (1) the use of the title Frat Rats in connection with the Delta House television series; (2) the defendants' failure to give the authors of Frat Rats screen credit for having written those parts of Frat Rats that were allegedly copied in Animal House; and (3) depriving plaintiff of the opportunity to produce the film, thereby depriving it of the screen credit that would have accompanied such production services. The first and third of these actions cannot support an unfair competition claim. Although the second of these actions does state an unfair competition claim, plaintiff's remedy for such a claim, under California law, is limited to injunctive relief.

As stated, the first amended complaint alleges that the defendants' use of the title "Frat Rats" in connection with the Delta House television series constitutes unfair competition. However, the undisputed evidence establishes that, although "Frat Rats" was considered as a possible title for the television sequel to Animal House, the defendants never used that name publicly, either in advertising or in screen credits, in connection with Delta House. Clearly, the defendants' limited internal use of the title Frat Rats in connection with the Delta House television series cannot support an unfair competition claim under California law. *See Allied Artists Pictures Corp. v. Friedman*, 68 Cal.App.3d 127, 133, 137 Cal.Rptr. 94 (1977); *Tomlin v. Walt Disney Productions*, 18 Cal.App.3d 226, 230, 96 Cal.Rptr. 118 (1971).

Plaintiff's contention that defendants have committed an act of unfair competition by depriving it of a valuable writing credit presents a more difficult question.[9] Historically, the law of unfair competition "was concerned primarily with wrongful conduct in commercial enterprises which resulted in business loss to another, ordinarily by the use of unfair means in drawing away customers from a competitor." *People v. National Research Company of California*, 201 Cal.App.2d 765, 20 Cal. Rptr. 516, 520 (1962). An individual deprived of a screen credit would not receive protection under this standard. *Cf. Suid v. Newsweek Magazine*, 503 F.Supp. 146, 149 (D.D.C.1980) ("plaintiff does not cite, and this court has been unable to locate, any case recognizing a common-law action for failure to attribute or misappropriate without attribution."). However, with the enactment of Civil Code § 3369, now codified as Business and Professions Code §§ 17200

---

**9.** Defendants initially argue that, since plaintiff did not actually write "Frat Rats", but rather is the assignee of rights in the screenplay, it lacks standing to challenge the defendants' failure to provide a screen credit to the screenplay's authors. Defendants contend that only Hart and Kerby, the writers of Frat Rats, have standing to raise an unfair competition claim predicated on a lack of writing credit. However, in light of the Hart assignment of June 24, 1977, *see, supra* at 4, in which he transferred to plaintiff "all now or hereafter existing rights of any kind and character whatsoever pertaining to [Frat Rats], whether or not such rights are now known, recognized, or contemplated ...", the court finds no merit in defendants' argument.

**1362**

and 17203 [10], the legal concept of unfair competition has broadened appreciably. In *Barquis v. Merchants Collection Association of Oakland, Inc.*, 7 Cal.3d 94, 109–112, 101 Cal.Rptr. 745, 496 P.2d 817 (1972), the California Supreme Court discussed the statutory expansion of unfair competition law:

> the legislature, by adopting section 3369, broadened the scope of legal protection against wrongful business practices generally ... Thus, section 3369 indicates that "unfair competition" as used in that section cannot be equated with the common law definition of "unfair competition," but instead specifies that, for the purposes of its provisions, unfair competition "shall mean and include *unlawful, unfair* or fraudulent business practice ..." [Emphasis in original.]
>
> ....
>
> ... [T]he legislature, in our view, intended by this sweeping language to permit tribunals to enjoin ongoing wrongful business conduct in whatever context such activity might occur.

■ In light of the expansive construction given statutory unfair competition by the California courts, the court has concluded that the defendants' alleged failure to provide plaintiff with a screen credit for having written portions of Animal House states a claim under Business and Professions Code § 17203. In reaching this conclusion, the court is guided by this Circuit's decision in *Smith v. Montoro*, 648 F.2d 602 (9th Cir.1981), a case construing § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In

that case, the plaintiff, Paul Smith, contracted to star in a film to be produced by an Italian film company. One term of Smith's contract allegedly provided that he would receive star billing in the screen credits and advertising for the film and that the film company would so provide in any subsequent distributing contracts. The Italian company then licensed defendants to distribute the film in the United States. Charging that the defendants removed his name and substituted the name of another actor in the film credits and advertising material, the plaintiff brought suit under the Lanham Act as well as under several state law theories.

In reviewing the district court's dismissal of the plaintiff's action for failure to state a claim under the Lanham Act, the Ninth Circuit noted that the Act is closely akin to unfair competition law. The court then described the broad protections accorded by the law of unfair competition to victims of unfair practices: "the law of unfair competition and trademarks has progressed far beyond the old concept of fraudulent passing off, to encompass any form of competition or selling which contravenes society's current concepts of 'fairness' " [11] *Id.* at 604. The Court concluded that the alleged deprivation of screen credits violated contemporary standards of fairness and that plaintiff's complaint, as a consequence, stated a valid claim under the Lanham Act. It stated that:

> [a]ccording to appellant's complaint, defendants not only removed appellant's

---

**10.** California Business and Professions Code § 17200, previously codified in California Civil Code § 3369(3), provides, in part, that,

> [a]s used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice....

Business and Professions Code § 17203, previously codified in Civil Code § 3369(2) provides that,

> [a]ny person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair com-

petition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

**11.** The court also quoted Learned Hand's statement in *Ely-Norris Safe Co. v. Mosler Safe Co.*, 7 F.2d 603 (2d Cir.1927), *rev'd on other grounds*, 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578 (1927) that,

> [t]here is no part of the law which is more plastic than unfair competition, and what was not recognized an actionable wrong twenty-five years ago may have become one today. *Smith,* 648 F.2d at 605 n. 1.

name from all credits and advertising, they also substituted a name of their own choosing ... [S]uch conduct ... is wrongful because it involves an attempt to misappropriate or profit from another's talents and workmanship. Moreover, ... the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product.

*Id.* at 606–07.

In *Smith,* the Ninth Circuit relied heavily upon the common law of unfair competition to assist in its construction of the Lanham Act. It is equally appropriate to rely in this unfair competition case upon *Smith,* a case that the Court finds to be persuasive authority. As in *Smith,* the plaintiff alleges that the defendants deprived it of a valuable screen credit, and that their action involves an attempt to misappropriate another's talents and workmanship. The Court believes that such a practice, which the Ninth Circuit found "unfair", is also "wrongful" and therefore is proscribed by § 17203.

Although plaintiff has stated a claim under California's statutory unfair competition law, its remedy under that law is limited to injunctive relief. In *Chern v. Bank of America,* 15 Cal.3d 866, 127 Cal.Rptr. 110, 544 P.2d 1310 (1976), the California Supreme Court sustained a dismissal of a private plaintiff's claim for damages under California Business and Professions Code § 17500 and § 17535, sections similar in language and construction to § 17200 and § 17203. The Court stated that "[p]laintiff's cause of action to recover damages for false or misleading statement ... was likewise properly dismissed. The applicable statutes do not authorize recovery of damages by private individuals. Private relief is limited to the filing of actions for an injunction ..." *Id.* at 875, 127 Cal.Rptr. 110, 544 P.2d 1310. Lower California courts have held that *Chern's* analysis is equally applicable to § 17200. *See Dunkerley v. Taylor,* 139 Cal.App.3d 1005, 189

Cal.Rptr. 294 (1983); *Sinclair v. Fotomat Corp.,* 140 Cal.App.3d 217, 189 Cal.Rptr. 393 (App.1983). In certain circumstances, courts may award monetary relief in statutory unfair competition actions; under Business and Professions Code § 17535, the section parallel to § 17203, "the trial court has authority to order *restitution* as a form of ancillary relief in ... an injunctive action ... [¶] [The court may do so if it] determines that such a remedy is necessary to deter future violations of the unfair trade practice statute or to foreclose the defendant's retention of any ill-gotten gains." (Emphasis added.) *Fletcher v. Security Pacific National Bank,* 23 Cal.3d 442, 454, 153 Cal.Rptr. 28 (1979). However, since plaintiff's unfair competition claim is not restitutionary in nature, this exception is inapplicable to the instant case. Therefore, plaintiff will be limited to injunctive relief barring future acts of unfair competition.

 Finally, plaintiff contends that defendants' failure to provide it a production credit constitutes unfair competition. Had plaintiff actually rendered production services in connection with Animal House and had defendants misappropriated such efforts by conferring the credit on someone else, plaintiff's contention might well have had merit. *Cf. Smith v. Montoro,* 648 F.2d at 607 n. 6 (noting that the district court had held that the failure to provide the producer of a television series with a screen credit and the conferral of such credit on someone else stated a claim under section 43(a) of the Lanham Act). However, in the instant case, plaintiff provided no production services in connection with Animal House. Rather, it hoped to provide these services if a film was made based on Frat Rats and, in its unfair competition claim, seeks compensation for the benefits that it would have derived from having done so. The law of unfair competition protects an individual against the misappropriation of his *efforts;* it does not protect him against the non-realization of his *hopes.* Plaintiff's speculative desire to receive production credit in connection with a

motion picture that it never produced does not state a claim for relief under California's unfair competition laws.

For the reasons set forth above,

IT IS ORDERED:

1. That defendants' motion to limit plaintiff's standing to sue for infringement of the Frat Rats copyright to the original material contributed by William Kerby is denied;

2. That defendants have established, without substantial controversy, that the creators of the Treatment had no access to the Frat Rats screenplay prior to submitting the Treatment to Universal;

3. That defendants' motion for partial summary judgment as to plaintiff's claim for statutory copyright infringement on the ground that plaintiff did not register the assignments by which it obtained rights in the Frat Rats copyright prior to instituting this litigation is denied;

4. That defendants' motion for partial summary judgment as to plaintiff's common law copyright claim is denied; and

5. That defendants' motion for partial summary judgment as to plaintiff's unfair competition claim is denied.