972 F.2d 939
 1992 Copr.L.Dec. P 26,963, 23 U.S.P.Q.2d 1864
 Derrick D. MOORE, Appellant,
v.
COLUMBIA PICTURES INDUSTRIES, INC., a Delaware corporation;
MCA Records, Inc., a California corporation; La'Face, Inc.,
a California corporation; Antonio Reid and Kenny Edmonds,
also known as L.A. and Babyface, Appellees.
 No. 91-2844.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 11, 1992.
Decided Aug. 14, 1992.
Rehearing and Rehearing En Banc Denied Oct. 9, 1992.
 
 David O. Carson, New York City, argued, for appellant.
 Russell J. Frackman, Los Angeles, Cal. argued (Bruce H. Little and Calvin L. Litsey, Minneapolis, Minn., and Gleam O. Davis, Los Angeles, Cal., on the brief), for appellees.
 Before RICHARD S. ARNOLD, Chief Judge, and LAY and HEANEY, Senior Circuit Judges.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Derrick D. Moore, a 28-year old, self-taught, Minneapolis songwriter and musician, composed a song he entitled "She Can't Stand It" in March, April, and early May 1989. With hopes of gaining a contract, Moore decided to submit the song to MCA Records. On March 22, 1989, Moore's agent, James Selmer, delivered two cassette tapes to Cheryl Dickerson, then MCA's Director of Artists and Repertoire, Black Artists Division, in Los Angeles. One of the tapes contained the instrumental version of "She Can't Stand It." Dickerson asked Selmer to send her a final version of "She Can't Stand It." Selmer complied with the request and sent her the final version on May 11. Moore registered the completed song with the United States Copyright Office on June 6, 1989. On the same day, Moore notified one of the defendants, Columbia Pictures Industries, that it was infringing his copyright through the use of the song "On Our Own" which was written by defendants, Antonio Reid and Kenny Edmonds. This song was subsequently used as the theme song in GHOSTBUSTERS II. Columbia promptly denied the charge of copyright infringement. On July 14, 1989, Moore filed an action against Columbia and the other defendants in the United States District Court for the District of Minnesota alleging infringement of his song "She Can't Stand It."
 
 
 2
 On February 8, 1991, the defendants jointly moved for summary judgment. The district court granted the motion on June 27, 1991, ruling that Moore's evidence was "insufficient to find access as a matter of law." It stated that Moore's evidence on this crucial issue was highly speculative, suggesting only a bare possibility of access; that defendants' song "On My Own" was not so strikingly similar to Moore's song so as to create an inference of access; and that Moore had not been able to challenge defendants' claim of independent creation.[1] It further stated that such independent creation alone "has been held to rebut a prima facie case of copying." We affirm.
 
 DISCUSSION
 I.
 
 3
 To establish copyright infringement, Moore must prove his ownership of the copyright[2] and copying by the defendants. Feist Publications, Inc. v. Rural Tel. Serv. Co., --- U.S. ----, ----, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). Typically, however, the latter element cannot be proven directly. Therefore, copying can be established by demonstration of access (by the alleged infringer) and substantial similarity (between the works at issue). See, e.g., Nelson v. PRN Prods., Inc., 873 F.2d 1141, 1142 (8th Cir.), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); 3 Melville B. Nimmer, Nimmer on Copyright § 13.01[B] (1992). We turn initially to the question of access.
 
 
 4
 Moore can establish access by showing that the defendants had an "opportunity to view or to copy" his work. See e.g., Sid & Mary Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1172 (9th Cir.1977); 3 Nimmer on Copyright § 13.02[A]. Establishing a "bare possibility" of access is not enough; rather, Moore must prove that the defendants had a "reasonable possibility" of viewing his work. See, e.g., Ferguson v. Nat'l Broadcasting Co., 584 F.2d 111, 113 (5th Cir.1978); 3 Nimmer on Copyright § 13.02[A]. A reasonable possibility of access can be established under the "corporate receipt doctrine."
 
 
 5
 [I]f the defendant is a corporation, the fact that one employee of the corporation has possession of plaintiff's work should warrant a finding that another employee (who composed defendant's work) had access to plaintiff's work, where by reason of the physical propinquity between the employees the latter has the opportunity to view the work in the possession of the former.
 
 
 6
 3 Nimmer on Copyright § 13.02[A]. Like other courts, we believe that the corporate receipt doctrine applies where there is a "relationship linking the intermediary and the alleged copier," even though the purported copier is not an employee of the intermediary. Meta-Film Assoc., Inc. v. MCA, Inc., 586 F.Supp. 1346, 1357 (C.D.Cal.1984); see also Ferguson, 584 F.2d at 113; Intersong-USA v. CBS, Inc., 757 F.Supp. 274, 281 (S.D.N.Y.1991).
 
 II.
 
 7
 Moore contends that the district court erred in ruling that Moore has not established a reasonable possibility that Reid and Edmonds obtained access to "She Can't Stand It" before they composed "On My Own." This case arises from summary judgment against Moore. Thus, viewing the facts and all reasonable inferences to be drawn therefrom in the light most favorable to Moore, we must determine whether any genuine issue exists as to any material fact. See, e.g., Stever v. Indep. School Dist. No. 625, 943 F.2d 845, 849 (8th Cir.1991).[3] Given this standard and based on the facts of this case, we agree with Moore's contention that sufficient facts have been presented to defeat the defendants' motion for summary judgment on the basis of access.
 
 
 8
 On March 22, 1989, James Selmer, Moore's manager and agent, met with Cheryl Dickerson, then Senior Director of Artists and Repertoire, Black Artists Division, in her Los Angeles office to convince MCA to sign a recording contract with Moore. As part of his presentation to Dickerson, Selmer played several cassette tapes of Moore's music, including an instrumental version of "She Can't Stand It." According to Selmer, Dickerson responded enthusiastically to "She Can't Stand It," exclaiming "I like this, I really like this," and told Selmer that her immediate supervisor and Vice President for Black Music at MCA, Louil Silas, "is going to love this track," and that she "want[ed] to offer this guy a deal; I want to offer him a contract. Would you get me a tape of six of his best songs all on one tape so that I can present it to Louil. Would you have Derrick take his time writing the lyrics [for 'She Can't Stand It']."
 
 
 9
 Dickerson then asked Selmer if she could keep the tape of "She Can't Stand It." Selmer hesitated, but decided to do so because of Dickerson's positive reaction to the song. Dickerson also requested that Moore select six of his best songs, including "She Can't Stand It," and compile them on a tape that she could give to Silas. On May 11, 1989, Selmer forwarded the requested "best of" tape to Dickerson, including a finalized version of "She Can't Stand It." Silas's "tape log," a book which listed the tape recordings received by Silas, indicates that the completed version of "She Can't Stand It" reached his desk. Despite Selmer's subsequent efforts to contact Dickerson, she never responded to his messages and they never talked again regarding Moore's work.
 
 
 10
 Dickerson's meeting with Selmer typified her responsibilities at MCA, where she was immediately supervised by Silas, and her duties included signing new recording artists. Dickerson testified that she had personally introduced Reid and Edmonds to several of MCA's performers. In fact, Dickerson introduced Reid to an MCA singer who eventually became his wife. Dickerson's office is located around the corner from Silas's office, who had worked with Reid and Edmonds in the past, sometimes making specific suggestions regarding the composition of songs. In either February or March of 1989, Silas suggested to Reid and Edmonds that they write a song for Bobby Brown (for whom Silas had previously produced songs composed by Reid and Edmonds) to sing for the GHOSTBUSTERS II soundtrack.
 
 
 11
 Accordingly, during February and March, Reid claims to have created a number of rhythm tracks (i.e., drum beats) at his Los Angeles home, including the drum beat for "On My Own." On March 21, 1989, he claims he delivered a copy of these tracks to Edmonds. On March 22, the same day Selmer met with Dickerson, Edmonds began creating the music to accompany the drum beat. On March 23, Reid and Edmonds composed the lyrics for "On My Own" with the intent of submitting the song for the GHOSTBUSTERS II soundtrack. The next day, March 24, Reid and Edmonds brought a floppy disc containing their creation to a Hollywood recording studio to transfer to a master tape. On March 31, Reid and Edmonds called Silas to let him know that they had completed a song that Silas might want to consider for Bobby Brown to sing for GHOSTBUSTERS II and proceeded to play "On My Own" for Silas over the phone.
 
 
 12
 In early April, Reid and Edmonds arranged for Silas to record a copy of "On My Own." After Silas did so, copies were provided to various individuals, including Bobby Brown and the director of GHOSTBUSTERS II, who liked the song but suggested a few minor changes, one of which resulted in the song being retitled "On Our Own." After Reid and Edmonds refined the song, the director agreed to use it in the movie, and MCA released "On Our Own" as a single in late May 1989 and as a track on the GHOSTBUSTERS II soundtrack a few weeks later.
 
 
 13
 When we consider these facts and their inferences in the light most favorable to Moore, we conclude that there was a reasonable possibility that Reid and Edmonds heard Moore's work before they composed "On My Own." Dickerson, Silas, Reid and Edmonds had on-going professional and personal relationships. Silas had worked previously with Reid and Edmonds on Bobby Brown songs, and he encouraged the songwriters to submit work for the GHOSTBUSTERS II soundtrack; similarly, although Dickerson was not directly involved with the GHOSTBUSTERS II project, she was close to Reid and Edmonds, she introduced Reid to his wife, and Silas (whose office was around the corner from Dickerson's) was her immediate supervisor. Dickerson obtained a copy of "She Can't Stand It" on the same day that Reid and Edmonds claimed that they began working on the music for "On My Own." She was initially so excited over Moore's music that she led Selmer to believe that Moore would receive a recording contract and told Selmer that Moore should take his time writing the lyrics for his song, presumably so they would be the same caliber as the instrumental version. Immediately thereafter, she lost interest in the instrumental version of "She Can't Stand It," and inexplicably never again contacted Selmer regarding Moore, although she had encouraged him to submit further copies of Moore's work so that Silas could evaluate it. These events, coupled with the fact that Dickerson's immediate supervisor, Silas, encouraged Reid and Edmonds, with whom he had worked in the past, to write a song for GHOSTBUSTERS II, persuade us that there was a reasonable possibility that Reid and Edmonds had access to the instrumental version of "She Can't Stand It" before they composed "On My Own."[4]
 
 
 14
 Case law supports our holding. See, e.g., Gaste v. Kaiserman, 863 F.2d 1061, 1066-67 (2d Cir.1988) (jury reasonably found access where plaintiff alleged that defendant-songwriter obtained a copy of his song through the defendant's publisher who had received a copy of plaintiff's song nearly twenty years earlier); Kamar Int'l, Inc. v. Russ Berrie and Co., 657 F.2d 1059, 1062 (9th Cir.1981) (" 'evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant' " (quoting 3 Nimmer on Copyright § 13.02[A] at 13-11 (1981))); Sanford v. CBS, Inc., 594 F.Supp. 711, 713 (N.D.Ill.1984) (summary judgment for defendant not appropriate where defendant expressed interest in plaintiff's song, requested to retain a copy of song, and mailed copy to Los Angeles office where alleged copier could have heard it); Nordstrom v. Radio Corp. of Am., 251 F.Supp. 41, 42 (D.Col.1965) (summary judgment for defendant not appropriate because plaintiff's work was in defendant's files during a period in which alleged copier could have accessed those files); compare with Ferguson v. Nat'l Broadcasting Co., Inc., 584 F.2d 111, 113 (5th Cir.1978) (access not found where purported 1973 copier did not have contact with five of the six recipients of plaintiff's work (each of whom returned plaintiff's work in 1953) and admitted contact with the sixth recipient but testified that contact was not related to plaintiff or her composition); Novak v. Nat'l Broadcasting Co., 752 F.Supp. 164, 169-72 (S.D.N.Y.1990) (access not found where network president denied ever reviewing plaintiff's work and his return of work to the plaintiff conformed with network's policy of returning submissions without reviewing them).
 
 
 15
 The case upon which MCA principally relies further supports our view. MCA identifies Meta-Film Associates, Inc. v. MCA, Inc., 586 F.Supp. 1346 (C.D.Cal.1984), as the leading case on the law of access and argues that the facts here parallel those in Meta-Film, where the district court concluded that access could only be established through a "tortious chain of hypothetical transmittals" and held that such a chain was insufficient to demonstrate access. Id. at 1355.
 
 
 16
 According to Meta-Film, "[i]n each of the[se] cases [where access had been found reasonably possible], an individual in a position to provide suggestions or comments with respect to the defendant's work--a supervisory employee or an employee within the unit from which the defendant's work was developed--had the opportunity to view the plaintiff's work." Id. at 1357. Here, Dickerson was in a position to provide suggestions (either directly or via Silas) to Reid and Edmonds and had the opportunity to hear "She Can't Stand It." Thus, "the key feature, the close relationship linking the intermediary and the alleged copier," seized upon by Meta-Film is present here. Id. Meta-Film isolated this key feature after reviewing several cases in which access was reasonably possible and concluded that in each of those cases
 
 
 17
 [t]he "intermediary", the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work.
 
 
 18
 Id. at 1355-56. Here, Silas supervised Reid and Edmonds' work to the extent that he suggested that they submit a song for the GHOSTBUSTERS II soundtrack and ultimately decided whether to accept their songs for MCA. Moreover, Silas testified that in the past he had visited Reid and Edmonds while they were working in their recording studio and made specific suggestions regarding their in-progress compositions. Thus, under Meta-Film and the cases from which it derived its principle, at least for summary judgment purposes, Moore has established that the defendants had a reasonable opportunity to view or copy his work. See Morrissey v. Proctor & Gamble Co., 379 F.2d 675, 677 (1st Cir.1967) (access inferred where plaintiff introduced evidence justifying the inference that specific company unit responsible for developing contests had received a copy of his allegedly infringed game, even though company employees denied knowledge of plaintiff's game); Bevan v. Columbia Broadcasting System, Inc., 329 F.Supp. 601, 610 (S.D.N.Y.1971) (jury should determine access issue because executive with responsibility for the allegedly infringing work had an opportunity to view the plaintiff's work); Smith v. Little, Brown & Co., 245 F.Supp. 451, 458 (S.D.N.Y.1965), aff'd 360 F.2d 928 (2d Cir.1966) (access found where managing editor with knowledge of plaintiff's work supervised juvenile editor, who was also aware of plaintiff's work, and juvenile editor assisted purported copier in preparing manuscript, which had the same subject matter of plaintiff's work). We therefore conclude that the district court erred in holding as a matter of law that Reid and Edmonds did not have a reasonable possibility of access to "She Can't Stand It" before they composed "On Our Own."
 
 
 19
 This conclusion does not end our analysis. As we stated at the outset of this discussion, in order to survive summary judgment, Moore must not only demonstrate access but also must establish a substantial similarity between his work and the alleged copy. This court previously has addressed the substantial similarity element on summary judgment. See, e.g., Nelson v. PRN Prods., Inc., 873 F.2d at 1143. Under the law of this court:
 
 
 20
 Determination of substantial similarity involves a two-step analysis. There must be substantial similarity "not only of the general ideas but of the expressions of those ideas as well." Sid & Mary Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir.1977). First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.
 
 
 21
 Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 (8th Cir.1987) (citations omitted). Thus, under Hartman, we first determine whether the details of the works contain objective similarities, and if they do, then we examine the works to ascertain if they are so dissimilar that ordinary, " 'reasonable minds [can]not differ as to the absence of substantial similarity in expression.' " Id. (quoting Litchfield v. Spielberg, 736 F.2d 1352, 1355-56 (9th Cir.1984)).
 
 
 22
 We rely on expert testimony to conduct the extrinsic test. As this court explained in Hartman, "expert opinion evidence is admissible in connection with the first step of the substantial similarity analysis to show similarity of ideas." Id. The defendants submitted the affidavits of four witnesses, Timothy Emmons, a professional musician; Ronald McCurdy, a University of Minnesota music professor; David Rivkin, a producer/songwriter; and Earl Spielman, a musicologist specializing in the analysis and comparison of musical compositions. Each of MCA's experts presented detailed affidavits in which they extensively analyzed the components of the songs and concluded that the components of the respective songs differed. According to Earl Spielman, "[b]ased on my analysis and comparison, it is my conclusion that the song 'On Our Own' does not share any elements of original musical expression with Plaintiff's instrumental track that would give rise to any inference of copying." David Rivkin concurred: "[F]rom my perspective as a composer, arranger, producer and engineer, there are absolutely no elements of original musical expression in the melodic chord progressions, basic song structure, and bass lines of the two songs which would give rise to an inference of copying." Ronald McCurdy also agreed: "There is absolutely no basis from a musicological perspective for concluding that 'On Our Own' is substantially similar to 'She Can't Stand It' or was copied from 'She Can't Stand It.' " More specifically, McCurdy characterized the melody, harmony, bass and accompaniment lines as "distinctly different," and Rivkin stated that "[t]he pitches, rhythms, and phrasing of the vocal melodic lines are different virtually throughout [both songs]."
 
 
 23
 Each of MCA's experts attributed any similarities between the songs as a result of their being from the same "R & B/hip-hop" genre. According to Rivkin, the "features [of the two songs] are musical ideas common to the R & B/hip-hop genre or relate to 'timbres' or 'sounds' (and not the compositions of the songs) and do not indicate original musical expression." Spielman similarly explained that "[w]hatever common general elements do exist between the two songs stem from the currently popular genre of R & B/hip-hop music to which both compositions belong...."
 
 
 24
 Moore offered the expert testimony of Michael McCormick, a professional musician with an expertise in the interrelationship between computers and music. During a deposition, McCormick testified that "On Our Own" was copied from "She Can't Stand It." In the sentence following this testimony, however, McCormick admitted that it was possible that "On Our Own" was not copied from "She Can't Stand It." Thus, Moore's expert wavered on the most important issue before him. Perhaps this indecision resulted because Moore's expert did not appear to be intimately familiar with the songs in question. For instance, he admitted that he could not musically classify the two songs in question and conceded that he could not remember ever before giving the opinion that "On My Own" was copied from or substantially similar to "She Can't Stand It."
 
 
 25
 In addition to admitting that he could not classify the songs as part of a particular genre, McCormick conceded that although he had heard of the term "hip-hop," he had no understanding of what it meant. In fact, even after he became involved in this case, Moore's expert did not investigate hip-hop music. Thus, he testified that he was not aware that a particular sound, beat, or base line characterized hip-hop music.
 
 
 26
 Given the strength and depth of MCA's experts' testimony, particularly in light of the inconclusive and unsubstantiated testimony of Moore's witness, we are convinced that under the extrinsic test established by Hartman, a reasonable factfinder could not find that "On Our Own" is substantially similar to "She Can't Stand It." See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' ") (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Therefore, we agree with the district court's summary judgment dismissal of this case.[5]
 
 CONCLUSION
 
 27
 Although Moore has established a reasonable possibility that Reid and Edmonds had an opportunity to copy his work, he has not demonstrated a substantial similarity between "She Can't Stand It" and "On Our Own." Accordingly, we affirm the district court's decision to grant the defendants' request for summary judgment.
 
 
 28
 LAY, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 29
 The panel is in agreement that the district court erred in granting defendants' motion for summary judgment on the issue of accessibility. Where there are conflicting inferences to be drawn from evidentiary facts, the jury, as the trier of fact, must resolve the conflict. This settled principle is so fundamental that it does not require citation.
 
 
 30
 My basic disagreement with the majority decision is that it resolves the case on the issue of substantial similarity when this issue was not passed upon by the district court. The issue was not raised in the appellant's brief. In their fifty page brief the appellees devote only a page and one-half to their discussion on substantial similarity; the appellant responds to the issue with a three and one-half page discussion in its reply brief.
 
 
 31
 The majority now finds no material dispute of fact on the issue of substantial similarity on the basis of its conclusion that the defendants' experts were more credible than those of the plaintiff. But credibility of expert witnesses is peculiarly an issue for the jury. However, notwithstanding this truism, the majority's reliance on the testimony of the various expert witnesses is completely misplaced. The majority correctly observes that expert witnesses may assist a finder of fact on the extrinsic test relating to similarity of ideas. See Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 (8th Cir.1987). Yet the majority, in evaluating the experts' testimony, fails to recognize that the defendants' experts admitted that there was similarity of ideas. See, e.g., Appellees' App. at 729 (p 7.c), 736 (p 22), 744 (p 8), 751 (p 22), 779-80 (pp 51-52, p 55).[1]
 
 
 32
 The majority overlooks that the defendants' expert testimony was offered to refute that there was no similarity of expression between the two songs. In crediting this testimony, the majority directly contradicts the holding of Hartman where we said: "analytical dissection and expert opinion are not called for under the second step in which substantial similarity of expression is measured by a different standard--the response of the ordinary, reasonable person." Hartman, 833 F.2d at 120 (citing Baxter v. MCA, Inc., 812 F.2d 421, 424 (9th Cir.), cert. denied, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987)); Nelson v. PRN Productions, Inc., 873 F.2d 1141, 1143 (8th Cir.), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989).
 
 
 33
 I feel it would be much fairer to the parties concerned to remand this case to the district court and have it pass upon the unresolved issues on summary judgment. In this way the parties can have an opportunity to fully brief the issue on appeal with the benefit of the district court's analysis. (There is even a dispute among the parties over the admissibility of a tape containing a comparison of the two songs. This should also be resolved by the district court.)
 
 
 34
 I have played the tape which contains the two musical compositions and although I do not know the difference between be-bop, hip-hop, and rock and roll, the tunes all sound the same to me. This may be because I have no ear for music other than reflecting my generation's preference for the more soothing rhythms of Glen Miller and Wayne King or the sophisticated beat of Woody Herman playing the Wood Chopper's Ball. Obviously judges have no expertise to resolve this kind of question--which is why jurors should tell us whether a composite vote of reasonable minds can or cannot find similarity of expression.
 
 
 
 [1]
 Because the district court did not find a reasonable possibility of access, it addressed the element of substantial similarity but did not base its holding on this issue. See text at 942 for a discussion of the elements necessary to prove copying. The district court mentioned "striking similarity," however, because "[w]here the similarity between the original and the copy is so striking as to preclude any possibility of independent creation, access may be inferred." Nelson v. PRN Prods., Inc., 873 F.2d 1141, 1142 n. 3 (8th Cir.) (citing Ferguson v. Nat'l Broadcasting Co., 584 F.2d 111, 113 (5th Cir.1978)), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989)
 
 
 [2]
 Defendants do not dispute Moore's ownership of a copyright for his song "She Can't Stand It."
 
 
 [3]
 Defendants dispute many of Moore's factual claims, but we have accepted Moore's claims as long as they are reasonably supported by the record, as we must at this stage in the proceedings
 
 
 [4]
 In their defense, the defendants note that Silas was in New York City during the March 22 meeting between Selmer and Dickerson and remained in New York until March 25, 1989, thus establishing that he could not have relayed Moore's work to Reid and Edmonds. At least two facts prevent us from deeming Silas' absence from Los Angeles dispositive. First, Dickerson knew Reid and Edmonds and could have supplied them with Moore's work without the intervention of Silas. Second, the record indicates that Silas willingly listened to potential songs over the phone; therefore, Dickerson might have played "She Can't Stand It" to Silas while he was in New York and he might have then instructed her to provide the song to Reid and Edmonds
 
 
 [5]
 Because of this ruling, we decline to review the district court's finding that Reid and Edmonds independently created "On Our Own." See Kamar Intern., Inc. v. Russ Berrie and Co., 657 F.2d 1059, 1062 (9th Cir.1981); see also Donald v. Uarco Business Forms, 478 F.2d 764, 765 (8th Cir.1973) ("[I]f a work is independently created, it is entitled to a copyright even though it is identical to a work in the public domain.")
 
 
 [1]
 For example, one of the defendants' experts, Dr. Earl V. Spielman, in his affidavit discloses:
 
 
 [51]
 Incidental Elements: My musical analysis revealed some incidental musical ideas common to both works. These commonalities are:
 a. Both songs are current examples of works that fit into the generic style of rhythm and blues, and specifically into the style known as "hip-hop."
 b. The recordings of both songs are performed in the key of E Minor, which is unquestionably one of the most common keys in all of music.
 c. As I have notated them, both songs are in 4/4 meter, which is unquestionably the most common meter of contemporary pop and rock music.
 d. The tempo of "She Can't Stand It" is 112 beats per minute, and that of "On Our Own" is 102 beats per minute, somewhat slower.
 e. The instrumentation of the two works share common instrumental sounds, namely sequenced and otherwise electronic drum sounds, synthesized electric bass; synthesized piano and other keyboards; guitars; male rhythm and blues style lead vocalist; and background vocalists. Thse [sic] sonic commonalities are typical of the genre of the songs and do not relate to any similarities in the musical compositional elements of the songs.
 
 
 [52]
 These shared musical ideas, as noted earlier, do not in any way evidence that one work was copied from the other. The kinds of commonalities identified above are simply those that relate to musical ideas used in thousand of songs, especially in the genre of R & B/hip-hop that both songs are written in
 
 
 [55]
 Any similarities that do exist relate to common musical ideas
 Appellees' App. at 779-80.