In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-2498

JCW INVESTMENTS, INC., d/b/a Tekky Toys,

*Plaintiff-Appellee,*

*v.*

NOVELTY, INC.,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4950—**Robert W. Gettleman**, *Judge.*

———————

ARGUED FEBRUARY 21, 2006—DECIDED MARCH 20, 2007

———————

Before MANION, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Meet Pull My Finger® Fred. He is a white, middle-aged, overweight man with black hair and a receding hairline, sitting in an armchair wearing a white tank top and blue pants. Fred is a plush doll and when one squeezes Fred's extended finger on his right hand, he farts. He also makes somewhat crude, somewhat funny statements about the bodily noises he emits, such as "Did somebody step on a duck?" or "Silent but deadly."

Fartman could be Fred's twin. Fartman, also a plush doll, is a white, middle-aged, overweight man with black hair and a receding hairline, sitting in an armchair

wearing a white tank top and blue pants. Fartman (as his name suggests) also farts when one squeezes his extended finger; he too cracks jokes about the bodily function. Two of Fartman's seven jokes are the same as two of the 10 spoken by Fred. Needless to say, Tekky Toys, which manufactures Fred, was not happy when Novelty, Inc., began producing Fartman, nor about Novelty's production of a farting Santa doll sold under the name Pull-My-Finger Santa.

Tekky sued for copyright infringement, trademark infringement, and unfair competition and eventually won on all claims. The district court awarded $116,000 based on lost profits resulting from the copyright infringement, $125,000 in lost profits attributable to trademark infringement, and $50,000 in punitive damages based on state unfair competition law. The district court then awarded Tekky $575,099.82 in attorneys' fees. On appeal, Novelty offers a number of arguments for why it should not be held liable for copyright infringement, argues that Illinois's punitive damages remedy for unfair competition is preempted by federal law, and contends that the attorneys' fees awarded by the district court should have been capped according to Tekky's contingent-fee arrangement with its attorneys. For the reasons set forth below, we affirm.

# I

Somewhat to our surprise, it turns out that there is a niche market for farting dolls, and it is quite lucrative. Tekky Toys, an Illinois corporation, designs and sells a whole line of them. Fred was just the beginning. Fred's creators, Jamie Wirt and Geoff Bevington, began working on Fred in 1997, and had a finished doll in 1999. They applied for a copyright registration on Fred as a "plush toy with sound," and received a certificate of copyright on

February 5, 2001; later, they assigned the certificate to Tekky. In the meantime, Tekky sent out its first Fred dolls to distributors in 1999. By the time this case arose, in addition to Fred, Tekky's line of farting plush toys had expanded to Pull My Finger® Frankie (Fred's blonde, motorcycle-riding cousin), Santa, Freddy Jr., Count Fartula (purple, like the Count on Sesame Street), and Fat Bastard (character licensed from New Line Cinema's "Austin Powers" movies), among others. By March 2004, Tekky had sold more than 400,000 farting dolls.

Novelty, a privately held Indiana corporation, is owned by Todd Green, its president. Green testified in his deposition, "any time we'd create an item, okay, we try to copy—or try to think of some relevant ideas." Novelty personnel go to trade shows and take pictures of other companies' products, seeking "ideas" for their own. In early 2001, Green visited the Hong Kong showroom of TL Toys, a manufacturer of Tekky's Fred doll, and he spotted Fred. In his deposition, Green testified that he might have photographed Fred since "[i]t wouldn't be unusual for us to photograph everything we see." Green admits that his idea for Fartman was based on Fred and that he described his idea to Mary Burkhart, Novelty's art director, who prepared a drawing based on Green's description. According to Burkhart, Green wanted "a plush doll that would . . . fart and shake. . . . And make a sound . . . a hillbilly-type guy, sitting in a chair that would fart and be activated by actually pulling his finger." Typically, Novelty would assign the job of drawing a new product to an artist, such as Burkhart, and the artist would then take her drawing to Green for his approval. That was the procedure it followed for Fartman. Novelty began to manufacture plush farting dolls around October 8, 2001; the first doll it released was the one it called Pull-My-Finger Santa. Fartman hit the stores one month later, on November 5, 2001.

Tekky first learned of Fartman in March 2002; three months later it filed this suit. In September 2002, the district court granted a preliminary injunction, halting Novelty's sales of Fartman and his smaller relative Fartboy. After the parties filed cross-motions for partial summary judgment, the district court granted Tekky's motion and found that Novelty had infringed Tekky's copyright when it copied Fred in order to create Fartman. The case then went to trial on several issues: damages for the copyright infringement, liability and damages for trademark infringement, and related state law claims. The jury found Novelty liable for trademark infringement for using the phrase "Pull My Finger" to sell the farting Santa dolls and found that Novelty's conduct was willful and wanton, justifying an award of punitive damages under Illinois's unfair competition law. The jury awarded $116,000 in damages for the copyright infringement, $125,000 for the trademark infringement, and $50,000 in punitive damages under state unfair competition law. On post-trial motions, the district court granted Tekky's request for prejudgment interest and ruled that Tekky was entitled to "its full attorneys' fees." After the filing of Tekky's fee petition and prior to the filing of a notice of appeal, the district court tolled the period for filing a notice of appeal in this case, following the procedure outlined in Federal Rule of Civil Procedure 58(c)(2) and Federal Rule of Appellate Procedure 4(a)(4)(A)(iii). See *Wikol ex rel. Wikol v. Birmingham Public Schools Bd. of Educ.*, 360 F.3d 604, 607-08 (6th Cir. 2004). The district court also appointed a special master to deal with the litigation over attorneys' fees, and that special master recommended awarding $596,399.82 to Tekky. Novelty objected, and the district court ultimately awarded $575,099.82. Following the award of attorneys' fees, Novelty filed a timely notice of appeal.

**II**

**A**

We begin with the district court's finding that Novelty violated Tekky's copyright when it created Fartman. As with any grant of summary judgment, partial or otherwise, we review the district court's decision *de novo*, viewing the facts in the light most favorable to the nonmoving party. See *Valentine v. City of Chicago*, 452 F.3d 670, 677 (7th Cir. 2006).

To establish copyright infringement, one must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991). What is required for copyright protection is "some minimal degree of creativity," or "the existence of . . . intellectual production, of thought, and conception." *Id.* at 362 (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 59-60 (1884)). Generally, copyright protection begins at the moment of creation of "original works of authorship fixed in any tangible medium of expression," including "pictorial, graphic, and sculptural" works and sound recordings. 17 U.S.C. § 102(a). A work is "fixed" in a tangible medium of expression "when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. See *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 909 (7th Cir. 2005). The owner of a copyright may obtain a certificate of copyright, which is "*prima facie* evidence" of its validity. 17 U.S.C. § 410(c). See *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994).

Once it is established that a party has a valid copyright, whether registered or not, the next question is whether another person has copied the protected work. Copying

may be proven by direct evidence, but that is often hard to come by. In the alternative, copying may be inferred "where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)). See also *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169-70 (7th Cir. 1997). It is not essential to prove access, however. If the "two works are so similar as to make it highly probable that the later one is a copy of the earlier one, the issue of access need not be addressed separately, since if the later work was a copy its creator must have had access to the original." *Ty, Inc.*, 132 F.3d at 1170. "The more a work is both like an already copyrighted work *and*—for this is equally important—unlike anything that is in the public domain, the less likely it is to be an independent creation." *Id.* at 1169 (emphasis in original). If the inference of copying is drawn from proof of access and substantial similarity, it can be rebutted if the alleged copier can show that she instead "independently created" the allegedly infringing work. *Susan Wakeen Doll Co.*, 272 F.3d at 450. "A defendant independently created a work if it created its own work without copying anything or if it copied something other than the plaintiff's copyrighted work." *Id.* (citing 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.11[D], at 12-175 (2001)).

Novelty contends that the district court protected too much of Tekky's toy—not just the expression but the idea or common elements known as *scènes à faire*, which we defined in *Atari* as "incidents, characters or settings which are as a practical matter indispensable or at least standard, in the treatment of a given topic." 672 F.2d at 616. Novelty also takes issue with the district court's finding that it had access to Fred, that Burkhart copied

rather than independently created Fartman, and that Fred and Fartman were substantially similar. As we explain below, we are unpersuaded. Tekky had a valid copyright in Fred, Novelty (the company) indisputably did have access to Fred, and the two dolls are so similar that the inference of copying even without access is irresistible.

Novelty does not argue that Tekky lacks a valid copyright in Fred or that Fred is so lacking in creativity that a copyright could not attach. Indeed, Fred is a far cry from a noncreative compilation of facts such as the telephone book in *Feist*. Here, we have a creative doll and a valid copyright registration. There is no doubt that there is a valid copyright. How much creativity Fred reflects and what ideas he embodies (as opposed to the way he expresses those ideas) merely help us to decide whether we can infer copying from substantial similarity.

It is notable that Green, Novelty's president, admits that he saw and perhaps photographed Fred, and that Fred gave him the idea for Fartman. While Burkhart denies having seen Fred or even a picture of him, she drew the model for Fartman at Green's direction. Moreover, Fred was already on the market in the United States at the time Fartman was created. In *Moore v. Columbia Pictures Industries, Inc.*, 972 F.2d 939, 942 (8th Cir. 1992), the Eighth Circuit found that a "reasonable possibility of access can be established under the 'corporate receipt doctrine,'" under which:

> if the defendant is a corporation, the fact that one employee of the corporation has possession of plaintiff's work should warrant a finding that another employee (who composed defendant's work) had access to plaintiff's work, where by reason of the physical propinquity between the employees the latter has the opportunity to view the work in the possession of the former.

*Id.* (quoting 3 NIMMER ON COPYRIGHT § 13.02[A]). In this
case, Novelty's president saw Fred, directed that the
artist draw a figure that looks like Fred, and from that
drawing approved the manufacture of Fartman. On those
facts, the corporate receipt doctrine may just be icing on
the cake; the fact that Green directed Burkhart as she
created the drawing, rather than taking pencil in hand
and sketching it himself, is immaterial. Novelty plainly
had access to Fred and used that access in the manufac-
ture of Fartman.

Even if access existed, Tekky had to show substantial
similarity between the two items in order to support an
inference of copying. The test for substantial similarity
is an objective one. See *Incredible Technologies, Inc. v.
Virtual Technologies, Inc.*, 400 F.3d 1007, 1011 (7th Cir.
2005) (noting that we look at "whether the accused work
is so similar to the plaintiff's work that an ordinary
reasonable person would conclude that the defendant
unlawfully appropriated the plaintiff's protectable expres-
sion by taking material of substance and value"). We
look at the dolls themselves to determine substantial
similarity; to give the reader some idea of what the dispute
is about, we have attached as an Appendix to this opinion
a photograph from the record that depicts Fred, Fartman,
and Fartboy. The pictures show that the similarities
between Fred and Fartman go far beyond the fact that
both are plush dolls of middle-aged men sitting in arm-
chairs that fart and tell jokes. Both have crooked smiles
that show their teeth, balding heads with a fringe of
black hair, a rather large protruding nose, blue pants that
are identical colors, and white tank tops. On the other
hand, Fartman has his name emblazoned in red across his
chest, his shoes are a different color from Fred's, as is his
chair, and Fartman wears a hat. In the end, despite the
small cosmetic differences, the two dolls give off more than
a similar air. The problem is not that both Fred and

Fartman have black hair or white tank tops or any other single detail; the problem is that the execution and combination of features on both dolls would lead an objective observer to think they were the same. See *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136-37 (2d Cir. 2004). We conclude that no objective person would find these dolls to be more than minimally distinguishable. To the contrary, they are substantially similar. That, in combination with Green's access, compels an inference of copying. Indeed, the dolls are so similar that an inference of copying could be drawn even without the evidence of access. See *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 926 (7th Cir. 2003).

Novelty contends that rather than copy, it merely made a similar doll based on the same comic archetype, that of "a typical man wearing jeans and a T-shirt in a chair doing the 'pull my finger' joke." That, Novelty argues, is the idea, not the expression, and the reason that the two dolls are similar is they are both based on that idea. The district court found that Novelty tried to shoehorn too much into the "idea" and that the only idea here is that of a "plush doll that makes a farting sound and articulates jokes when its finger is activated." As the district court put it:

> Fred—a smiling, black-haired balding Caucasian male, wearing a white tank top and blue pants, reclining in a green armchair, who makes a farting sound, vibrates and utters phrases such as "Did somebody step on a duck?" and "Silent but deadly" after the protruding finger on his right hand is pinched—is plaintiff's expression of that idea.

It is, of course, a fundamental tenet of copyright law that the idea is not protected, but the original expression of the idea is. See *Feist*, 499 U.S. at 348-49. Although it is not always easy to distinguish idea from expression, by the same token the task is not always hard. Novelty urges

that the similarity of the two dolls reflects the fact that Fred himself is only minimally creative, representing a combination of elements that were in the public domain or were *scènes à faire*. The problem with this argument is that the very combination of these elements as well as the expression that is Fred himself are creative.

Novelty wants us to take the entity that is Fred, subtract each element that it contends is common, and then consider whether Novelty copied whatever leftover components are creative. But this ignores the fact that the details—such as the appearance of Fred's face or even his chair—represent creative expression. It is not the idea of a farting, crude man that is protected, but this particular embodiment of that concept. Novelty could have created another plush doll of a middle-aged farting man that would seem nothing like Fred. He could, for example, have a blond mullet and wear flannel, have a nose that is drawn on rather than protruding substantially from the rest of the head, be standing rather than ensconced in an armchair, and be wearing shorts rather than blue pants. To see how easy this would be, one need look no further than Tekky's Frankie doll, which is also a plush doll, but differs in numerous details: he is not sitting, and he has blond hair, a tattoo, and a red-and-white striped tank. Frankie is not a copy of Fred. Fartman is. We have no trouble concluding that the district court properly granted partial summary judgment to Tekky on the issue of liability for copyright infringement.

**B**

The jury found Novelty liable for trademark infringement because Novelty used the words "Pull My Finger" to sell its farting Santa dolls, and this use infringed Novelty's mark for those words as related to plush dolls. The jury found that action to be willful, justifying the award of

$50,000 in punitive damages under Illinois common law. On appeal, Novelty contends that the Lanham Act preempts the state law provision permitting punitive damages, although it admits that such a holding would be "an extension of the law."

Whether federal law preempts state law is a question we review *de novo*. See *Toney*, 406 F.3d at 907-08. In 1992, this court in *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499 (7th Cir. 1992), expressed concern about the award of punitive damages in a trademark suit:

> Punitive damages are problematic because the Lanham Act, although providing for the trebling of compensatory damages, forbids other penalties. The district court found a punitive award authorized by the laws of Illinois without explaining where one finds such authorization. The parties have been of no greater assistance. Because some old cases say that Illinois law supports punitive damages in trademark cases, and L'Oréal has not asked us to revisit the subject, we press forward.

*Id.* at 507 (internal citations omitted). In *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 641 (7th Cir. 2003), we assumed that punitive damages were available under Illinois law but found that the defendant there had not acted willfully so as to merit them. The magistrate judge in this case noted that this remained an "issue of first impression" because "[o]ther courts have upheld awards of punitive damages for unfair competition when a compensatory award was also given under the Lanham Act, but none of the courts discussed whether punitive damages should be available."

Federal law preempts state law in three situations: (1) when the federal statute explicitly provides for preemption; (2) when Congress intended to occupy the field

completely; and (3) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64-65 (2002) (internal quotation marks and citations omitted). In this case, only the third option is applicable. The Lanham Act provides:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. *Such sum in either of the above circumstances shall constitute compensation and not a penalty*.

15 U.S.C. § 1117(a) (emphasis added). One could imagine characterizing the punitive damages permitted by state law as a means of reaching a "just sum," but we are not willing to strain the language this far. In reality punitive damages are intended to be a penalty. Thus federal law

permits compensation, or a just sum, and not a penalty such as punitive damages. But it also does not expressly forbid punitive damages in a way that would preempt the state law remedy, and it is not clear from this passage that punitive damages would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Indeed, punitive damages might be another useful tool in reaching those objectives. Compare *California v. ARC America Corp.*, 490 U.S. 93, 105 (1989) (holding that state antitrust suits on behalf of indirect purchasers are not preempted despite greatly increased exposure to damages, and commenting that "[o]rdinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law").

A leading treatise on trademark law, McCarthy on Trademarks, assumes that such damages are permitted: "While Lanham Act § 35 does not authorize an additional award of punitive damages for willful infringement of a registered trademark or for a violation of § 43(a), punitive damages are still available for accompanying state, non-federal causes of action for trademark infringement." J. THOMAS MCCARTHY, 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:97 (4th ed. 2005).

The First Circuit recently analyzed preemption of state law remedies by the Lanham Act in *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006). In that case, the remedies at issue were attorneys' fees and double damages. Under the Lanham Act, attorneys' fees are awarded only in "exceptional cases" and enhanced damages are awarded "subject to principles of equity." 15 U.S.C. § 1117(a). In contrast, New Hampshire law awards attorneys' fees automatically and "offers enhanced damages automatically upon a showing that the violation was willful or knowing." 436 F.3d at 40-41. The First Circuit described the question as "whether New Hampshire's

laxer standard for an award of attorneys' fees or its mandatory award of enhanced damages undermines the policy of the federal statute." *Id.* at 41. The court acknowledged that the state law "does create a stronger incentive for plaintiffs to bring unfair competition suits against trademark infringers," and that Congress intentionally used a "less favorable incentive structure for federal suits." *Id.* Nonetheless, the court pointed out, "Congress did not prohibit state unfair competition statutes that might have *substantive* terms somewhat more favorable to plaintiffs than the Lanham Act." *Id.* at 42 (emphasis in original). In the case before it, New Hampshire's law was substantively the same as the federal law, but the remedial structure was more generous. The court was unpersuaded that Congress meant to permit the former and forbid the latter: "to complain in this case about the modest deviation in remedial benefits favorable to plaintiffs is to swallow the camel but strain at the gnat." *Id.* Contrasting the Lanham Act, which "primarily provides a federal forum for what is in substance a traditional common-law claim," with other more complete federal regulatory regimes, it concluded that the state law remedies survive. See also *Tonka Corp. v. Tonk-A-Phone, Inc.*, 805 F.2d 793 (8th Cir. 1986) (*per curiam*) (holding the same for a conflicting attorneys' fees provision).

Punitive damages are not the same as attorneys' fees, but we find the logic reflected in *Attrezzi* equally applicable here. Even the portion of the Lanham Act indicating that the compensation under federal law shall not constitute a "penalty" does not, either expressly or by necessary implication, mean that state laws permitting punitive damages under defined conditions are preempted. We agree with the First Circuit that, to the extent that state substantive law survives and is coterminous with federal law in this area, state law remedies should survive as well. In the area of trademark law, preemption is the excep-

tion rather than the rule. For example, when Congress amended the federal trademark laws to deal with cybersquatting, it left the state law regimes (including damages rules) in place. See *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 500-01 (2d Cir. 2000) (citing a legislative report indicating that the law was not designed to preempt state law remedies). In light of the fact that the Lanham Act has not been interpreted as a statute with broad preemptive reach, we conclude that Congress would have acted more clearly if it had intended to displace state punitive damage remedies. Aside from preemption, there is no other reason to refrain from affirming the jury's award of punitive damages in this case.

## C

Lastly, Novelty contends the attorneys' fees that the district court awarded, $575,099.82, were too high. The Copyright Act permits a district court to award attorneys' fees "in its discretion." 17 U.S.C. § 505. Similarly, "[a] decision to award attorneys' fees under the Lanham Act is firmly committed to the district court's discretion." *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1099 (7th Cir. 1994). This court reviews attorneys' fees decisions for abuse of discretion.

In this case, Tekky entered into a contingent-fee agreement with its attorneys, the terms of which are not before us. Novelty assumes that the fee agreement contains a standard clause under which two-thirds of the amount recovered would go to Tekky and one-third to the attorneys. It argues in essence this agreement caps the amount that Tekky's attorneys may recover. In Novelty's view, at the high end, we should take the jury's award of $291,000 as the two-thirds and add one more third on top of that, or $145,000, making the total award $436,000. The district

court rejected the idea that it could award only contractual fees to Tekky's lawyers and opted instead to use the traditional lodestar approach, under which it began with the hours that Tekky's attorneys worked, the tasks they performed, and their hourly rates, to come up with a preliminary total. Because the fee petition was hotly disputed, the district court appointed a special master to resolve these ancillary disputes. The master issued a 54-page report recommending a total award of $596,399.82. The court commented that "the case took on a life of its own unnecessarily and litigiously," observing that Novelty unnecessarily increased the fees sought by "contesting practically every issue." In addition, the court noted, "without proof that plaintiff's attorneys fabricated time records or padded them in an inappropriate matter, there is simply no reason to reduce the fees generated by time that was so obviously well-spent from plaintiff's perspective." The special master did reduce several items from Tekky Toys' fee request, reductions the district court found to be reasonable. The district court also reduced the amount awarded for expenses between the two fee petitions from $80,000 to $60,000 and reduced the reimbursement for some foam boards.

Novelty's argument for replacing the lodestar with the fee agreement is based on *City of Burlington v. Dague*, 505 U.S. 557 (1992), in which the Court rejected a "contingency enhancement" under fee-shifting statutes where the prevailing party sought more than the lodestar as a reward for the risk of obtaining nothing had the party not prevailed. The Court found that awarding more than the lodestar was not permitted under two environmental laws and more generally under federal statutes that permit the "prevailing party" to collect fees: "The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence. We have established a 'strong presumption' that the lodestar represents the 'reasonable' fee, and have placed upon the fee applicant who seeks

more than that the burden of showing that 'such an adjustment is *necessary* to the determination of a reasonable fee.'" *Id.* at 562 (internal citations omitted) (emphasis in original).

What Novelty fails to appreciate, however, is that the Supreme Court held in *Blanchard v. Bergeron*, 489 U.S. 87 (1989), that an attorney's fee allowed under 42 U.S.C. § 1988 is *not* limited to the amount provided in a contingent-fee arrangement. The Court later held, in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), that prevailing plaintiffs and prevailing defendants in copyright cases must be treated alike, for purposes of fee awards; thus, the rules articulated in *Blanchard* for computing fees for the prevailing party apply with equal force to copyright cases. Nothing in *Dague*, which dealt with an enhancement *above* the lodestar, suggests a retreat from the holding in *Blanchard*. In *Blanchard*, as here, the lodestar method led to an award greater than the contingent-fee arrangement would have yielded. In *Assessment Technologies of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434 (7th Cir. 2004), although we commented that usually attorney's fee contracts are given "controlling weight" for purposes of assigning value to a lawyer's work, *id.* at 438, we recognized that contingent-fee contracts are different. In the case of contingent-fee arrangements, "were it not for the expectation of an additional, court-ordered award if the suit was successful but yielded little in the way of damages, the plaintiff might not have been able to interest a lawyer in taking the case in the first place. *So the percentage specified in the contract should not cap such awards.*" *Id.* at 439 (emphasis added).

That is enough to resolve the case before us. Although the fees here were high—roughly double the damages—our review of the special master's report and the district court decision reveals no abuse of discretion.

We AFFIRM the judgment of the district court.

APPENDIX

No. 05-2498                                                    19

A true Copy:

    Teste:


                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*