In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1296

DANIEL P. SCHROCK, d/b/a
DAN SCHROCK PHOTOGRAPHY,

*Plaintiff-Appellant,*

*v.*

LEARNING CURVE INTERNATIONAL, INC.,
RC2 BRANDS, INC., and HIT ENTERTAINMENT,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6927—**Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 9, 2008—DECIDED NOVEMBER 5, 2009

Before FLAUM, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* HIT Entertainment ("HIT") owns the copyright to the popular "Thomas & Friends" train characters, and it licensed Learning Curve International ("Learning Curve") to make toy figures of its characters. Learning Curve in turn hired Daniel Schrock, a professional photographer, to take pictures of the toys for

promotional materials. Learning Curve used Schrock's services on a regular basis for about four years and thereafter continued to use some of his photographs in its advertising and on product packaging. After Learning Curve stopped giving him work, Schrock registered his photos for copyright protection and sued Learning Curve and HIT for infringement.

The district court granted summary judgment for the defendants, holding that Schrock has no copyright in the photos. The court classified the photos as "derivative works" under the Copyright Act—derivative, that is, of the "Thomas & Friends" characters, for which HIT owns the copyright—and held that Schrock needed permission from Learning Curve (HIT's licensee) not only to make the photographs but also to copyright them. Because Schrock had permission to make but not permission to copyright the photos, the court dismissed his claim for copyright infringement.

We reverse. We assume for purposes of this decision that the district court correctly classified Schrock's photographs as derivative works. It does not follow, however, that Schrock needed authorization from Learning Curve to copyright the photos. As long as he was authorized to make the photos (he was), he owned the copyright in the photos to the extent of their incremental original expression. In requiring permission to make *and* permission to copyright the photos, the district court relied on language in *Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983), suggesting that both are required for copyright in a derivative work. We have more recently

explained, however, that copyright in a derivative work arises by operation of law—not through authority from the owner of the copyright in the underlying work— although the parties may alter this default rule by agreement. *See Liu v. Price Waterhouse LLP*, 302 F.3d 749, 755 (7th Cir. 2002). Schrock created the photos with permission and therefore owned the copyright to the photos *provided* they satisfied the other requirements for copyright and the parties did not contract around the default rule.

We also take this opportunity to clarify another aspect of *Gracen* that is prone to misapplication. *Gracen* said that "a derivative work must be substantially different from the underlying work to be copyrightable." 698 F.2d at 305. This statement should not be understood to require a heightened standard of originality for copyright in a derivative work. We have more recently explained that "the only 'originality' required for [a] new work to be copyrightable . . . is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its predecessors." *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003). Here, Schrock's photos of Learning Curve's "Thomas & Friends" toys possessed sufficient incremental original expression to qualify for copyright.

But the record doesn't tell us enough about the agreements between the parties for us to determine whether they agreed to alter the default rule regarding copyright or whether Learning Curve had an implied license to

continue to use Schrock's photos. Whether Schrock could copyright his photographs and maintain an infringement action against the defendants depends on the contractual understandings between Schrock, Learning Curve, and HIT. Accordingly, we remand to the district court for further proceedings consistent with this opinion.

## I. Background

HIT is the owner of the copyright in the "Thomas & Friends" properties, and Learning Curve[1] is a producer and distributor of children's toys. HIT and Learning Curve entered into a licensing agreement granting Learning Curve a license to create and market toys based on HIT's characters. HIT and Learning Curve maintain (through an affidavit of HIT's vice-president of licensing) that HIT retained all intellectual-property rights in the works produced under the license. The licensing agreement, however, is not in the record.

In 1999 Learning Curve retained Daniel Schrock to take product photographs of its toys, including those based on HIT's characters, for use in promotional materials. On numerous occasions during the next four years, Schrock photographed several lines of Learning Curve's toys, including many of the "Thomas & Friends" toy trains, related figures, and train-set accessories. (We have

---

[1] RC2 Corporation acquired Learning Curve in early 2003. For simplicity we refer to Learning Curve, RC2 Corporation, and their affiliates collectively as "Learning Curve."

attached two of the photos as examples, although they are extremely poor copies because the originals are in color.) Schrock invoiced Learning Curve for this work, and some of the invoices included "usage restrictions" purporting to limit Learning Curve's use of his photographs to two years. Learning Curve paid the invoices in full—in total more than $400,000.

Learning Curve stopped using Schrock's photography services in mid-2003 but continued to use some of his photos in its printed advertising, on packaging, and on the internet. In 2004 Schrock registered his photos for copyright protection and sued HIT and Learning Curve for infringement; he also alleged several state-law claims. HIT and Learning Curve moved for summary judgment, arguing primarily that Schrock's photos were derivative works and not sufficiently original to claim copyright protection, and that neither HIT nor Learning Curve ever authorized Schrock to copyright the photos. They argued in the alternative that Schrock granted them an unlimited oral license to use the photos.

The district court granted summary judgment for the defendants. The judge began by noting the long tradition of recognizing copyright protection in photographs but said he would nonetheless "eschew" the question whether Schrock's photographs were sufficiently original to copyright. The judge focused instead on whether the photos were derivative works under the Copyright Act and concluded that they were. Then, following language in *Gracen*, the judge held that Learning Curve's permission to make the photos was not enough to trigger Schrock's copyright in them; the judge said Schrock

must also have Learning Curve's permission to copyright the photos. Schrock did not have that permission, so the judge concluded that Schrock had no copyright in the photos and dismissed his claim for copyright infringement.[2] Schrock appealed.

## II. Discussion

Schrock argues that the district judge mistakenly classified his photos as derivative works and misread or misapplied *Gracen*. He contends that his photos are not derivative works, and even if they are, his copyright is valid and enforceable because he had permission from Learning Curve to photograph the underlying copyrighted works and his photos contained sufficient incremental original expression to qualify for copyright. HIT and Learning Curve defend the district court's determination that the photos are derivative works and argue that the court properly read *Gracen* to require permission to copyright as well as permission to make the derivative works. Alternatively, they maintain that Schrock's photographs contain insufficient originality to be copyrightable and that copyright protection is barred under the *scènes à faire* or merger doctrines. Finally, the defendants ask us to affirm on the independent ground that Schrock orally granted them an unlimited license to use his works.

---

[2] Having dismissed the federal-copyright claim, the court relinquished jurisdiction over the state-law claims.

As a general matter, a plaintiff asserting copyright infringement must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). There is no dispute here about copying; Learning Curve used Schrock's photos in its promotional materials. The focus instead is on the validity of Schrock's asserted copyright in the photos. The Copyright Act provides that "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). In this circuit, copyrightability is an issue of law for the court. *Gaiman v. McFarlane*, 360 F.3d 644, 648-49 (7th Cir. 2004).

Much of the briefing on appeal—and most of the district court's analysis—concerned the classification of the photos as derivative works. A "derivative work" is:

> [A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. The Copyright Act specifically grants the author of a derivative work copyright protection in the

incremental original expression he contributes as long as the derivative work does not infringe the underlying work. *See id.* § 103(a), (b); *see also Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000); *Lee v. A.R.T. Co.*, 125 F.3d 580, 582 (7th Cir. 1997). The copyright in a derivative work, however, "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b).

## A. Photographs as Derivative Works

Whether photographs of a copyrighted work are derivative works is the subject of deep disagreement among courts and commentators alike. *See* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 3.03[C][1], at 3-20.3 (Aug. 2009). The district court held that Schrock's photos came within the definition of derivative works because they "recast, transformed, or adapted" the three-dimensional toys into a different, two-dimensional medium. For this conclusion the judge relied in part on language in *Gracen* and in the Ninth Circuit's decision in *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068 (9th Cir. 2000), recognizing, however, that neither decision directly decided the matter. *Gracen* did not involve photographs at all, and although *Ets-Hokin* did, the Ninth Circuit ultimately sidestepped the derivative-works question and rested its decision on other grounds. *Id.* at 1081.

The judge also cited other decisions in this circuit that appear to support the conclusion that photographs are

derivative works, but these, too (and again, as the judge properly acknowledged), did not directly address the question. *Ty, Inc. v. Publications International Ltd.*, 292 F.3d 512, 519 (7th Cir. 2002), involved unauthorized "Beanie Babies" collector's guides that incorporated photographs of the popular beanbag plush toys into the text. We said there that "photographs of Beanie Babies are derivative works from the copyrighted Beanie Babies themselves," but this statement was based entirely on the parties' concession that the photographs were derivative works. *Id. Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir. 1987), made a passing remark suggesting that photographs of Norman Rockwell illustrations were derivative works, but that was not an issue in the case, *id.* at 1201; the issue instead was whether certain terms in a licensing agreement (specifically, no-contest and arbitration clauses) were enforceable, *id.* at 1193.

We need not resolve the issue definitively here. The classification of Schrock's photos as derivative works does not affect the applicable legal standard for determining copyrightability, although as we have noted, it does determine the scope of copyright protection. Accordingly, we will assume without deciding that each of Schrock's photos qualifies as a derivative work within the meaning of the Copyright Act.

## B. Originality and Derivative Works

As a constitutional and statutory matter, "[t]he *sine qua non* of copyright is originality." *Feist Publ'ns, Inc.*, 499

U.S. at 345; *see* 17 U.S.C. § 102. Originality in this context "means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc.*, 499 U.S. at 345. The Supreme Court emphasized in *Feist* that "the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* The Court also explained that "[o]riginality does not signify novelty; a work may be original even though it closely resembles other works." *Id.* What is required is "independent creation plus a modicum of creativity." *Id.* at 346.

Federal courts have historically applied a generous standard of originality in evaluating photographic works for copyright protection. *See, e.g., Ets-Hokin*, 225 F.3d at 1073-77; *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 305 (S.D.N.Y. 2000). In some cases, the original expression may be found in the staging and creation of the scene depicted in the photograph. *See, e.g., Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452 (S.D.N.Y. 2005). But in many cases, the photographer does not invent the scene or create the subject matter depicted in it. Rather, the original expression he contributes lies in the *rendition* of the subject matter—that is, the effect created by the combination of his choices of perspective, angle, lighting, shading, focus, lens, and so on. *See id.; Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) ("Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."). Most photographs

contain at least some originality in their rendition, *see Mannion*, 377 F. Supp. 2d at 452 ("Unless a photograph replicates another work with total or near-total fidelity, it will be at least somewhat original in the rendition."), except perhaps for a very limited class of photographs that can be characterized as "slavish copies" of an underlying work, *Bridgeman Art Library, Ltd. v. Corel Corp.*, 25 F. Supp. 2d 421, 427 (S.D.N.Y. 1998) (finding no originality in transparencies of paintings where the goal was to reproduce those works exactly and thus to minimize or eliminate any individual expression).

Our review of Schrock's photographs convinces us that they do not fall into the narrow category of photographs that can be classified as "slavish copies," lacking any independently created expression. To be sure, the photographs are accurate depictions of the three-dimensional "Thomas & Friends" toys, but Schrock's artistic and technical choices combine to create a two-dimensional image that is subtly but nonetheless sufficiently his own.[3] This is confirmed by Schrock's deposition testimony describing his creative process in

---

[3] We note, however, that a mere shift in medium, without more, is generally insufficient to satisfy the requirement of originality for copyright in a derivative work. *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980) (noting that circuit's rejection of "the contention that the originality requirement of copyrightability can be satisfied by the mere reproduction of a work of art in a different medium"); *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d Cir. 1976) (same).

depicting the toys. Schrock explained how he used various camera and lighting techniques to make the toys look more "life like," "personable," and "friendly." He explained how he tried to give the toys "a little bit of dimension" and that it was his goal to make the toys "a little bit better than what they look like when you actually see them on the shelf." The original expression in the representative sample is not particularly great (it was not meant to be), but it is enough under the applicable standard to warrant the limited copyright protection accorded derivative works under § 103(b).

Aside from arguing that the works fail under the generally accepted test for originality, Learning Curve and HIT offer two additional reasons why we should conclude that Schrock's photographs are not original. First, they claim that the photos are intended to serve the "purely utilitarian function" of identifying products for consumers. The purpose of the photographs, however, is irrelevant. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903); *SHL Imaging, Inc.*, 117 F. Supp. 2d at 311 ("That the photographs were intended solely for commercial use has no bearing on their protectibility.").

The defendants' second and more substantial argument is that it is not enough that Schrock's photographs might pass the ordinary test for originality; they claim that as derivative works, the photos are subject to a higher standard of originality. A leading copyright commentator disagrees. The Nimmer treatise maintains that the quantum of originality required for copyright in a derivative work is the same as that required for copyright

in any other work. *See* 1 NIMMER ON COPYRIGHT § 3.01, at 3-2, § 3.03[A], at 3-7. More particularly, Nimmer says the relevant standard is whether a derivative work contains a "nontrivial" variation from the preexisting work "sufficient to render the derivative work distinguishable from [the] prior work in any meaningful manner." *Id*. § 3.03[A], at 3-10. The caselaw generally follows this formulation. *See, e.g.*, *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir. 1982) (holding that numerous minor changes in an illustration of Paddington Bear were sufficiently nontrivial because they combined to give Paddington a "different, cleaner 'look'"); *Millworth Converting Corp. v. Slifka*, 276 F.2d 443, 445 (2d Cir. 1960) (holding that embroidered reproduction of a public-domain embroidery of Peter Pan was sufficiently distinguishable because the latter gave a "three-dimensional look" to the former embroidery).

Learning Curve and HIT argue that our decision in *Gracen* established a more demanding standard of originality for derivative works. *Gracen* involved an artistic competition in which artists were invited to submit paintings of the character Dorothy from the Metro-Goldwyn-Mayer ("MGM") movie *The Wizard of Oz.* Participating artists were given a still photograph of Dorothy from the film as an exemplar, and the paintings were solicited and submitted with the understanding that the best painting would be chosen for a series of collector's plates. *Gracen*, 698 F.2d at 301. Plaintiff Gracen prevailed in the competition, but she refused to sign the contract allowing her painting to be used in the collector's plates.

The competition sponsor commissioned another artist to create a similar plate, and Gracen sued the sponsor, MGM, and the artist for copyright infringement. We held that Gracen could not maintain her infringement suit because her painting, a derivative work, was not "substantially different from the underlying work to be copyrightable." *Id.* at 305.

*Gracen* drew this language from an influential Second Circuit decision, *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486 (2d Cir. 1976). Read in context, however, the cited language from *L. Batlin* did not suggest that a heightened standard of originality applies to derivative works.[4] To the contrary, the Second Circuit said only that to be copyrightable a work must "'contain some substantial, not merely trivial originality.'" *Id.* at 490 (quoting

---

[4] To the extent that *Gracen*'s reading of *L. Batlin* and its "substantial difference" language can be understood as establishing a more demanding standard of originality for derivative works, it has received mixed reviews. Some commentators have suggested that *Gracen* may have inappropriately narrowed the copyrightability of derivative works without a statutory basis. *See* 1 NIMMER ON COPYRIGHT § 3.03[A], at 3-11; 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 3:53 (2009). The Nimmer treatise notes that *Gracen*'s focus on the word "substantial" reads the language from *L. Batlin* out of context because *L. Batlin* simply applied the prevailing "distinguishable variation" test, described above. *See* 1 NIMMER ON COPYRIGHT § 3.03[A], at 3-11 n.24. The Third Circuit has agreed and explicitly rejected *Gracen*'s interpretation of *L. Batlin*. *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 564 (3d Cir. 2002).

*Chamberlin v. Uris Sales Corp.*, 150 F.2d 512, 513 (2d Cir. 1945)). The court explained that for derivative works, as for any other work, "[t[he test of originality is concededly one with a low threshold in that all that is needed is that the author contributed something more than a merely trivial variation, something recognizably his own." *Id.* (internal quotation marks and ellipsis omitted).

The concern expressed in *Gracen* was that a derivative work could be so similar in appearance to the underlying work that in a subsequent infringement suit brought by a derivative author, it would be difficult to separate the original elements of expression in the derivative and underlying works in order to determine whether one derivative work infringed another. The opinion offered the example of artists A and B who both painted their versions of the Mona Lisa, a painting in the public domain. *See Gracen*, 698 F.2d at 304. "[I]f the difference between the original and A's reproduction is slight, the difference between A's and B's reproductions will also be slight, so that if B had access to A's reproductions the trier of fact will be hard-pressed to decide whether B was copying A or copying the Mona Lisa itself." *Id*.

No doubt this concern is valid. But nothing in the Copyright Act suggests that derivative works are subject to a more exacting originality requirement than other works of authorship. Indeed, we have explained since *Gracen* that "the only 'originality' required for [a] new work to by copyrightable . . . is enough expressive variation from public-domain or other existing works to enable the new work to be readily distinguished from its

predecessors." *Bucklew,* 329 F.3d at 929. We emphasized in *Bucklew* that this standard does not require a "high degree of [incremental] originality." *Id.*

We think *Gracen* must be read in light of *L. Batlin,* on which it relied, and *Bucklew,* which followed it. And doing so reveals the following general principles: (1) the originality requirement for derivative works is not more demanding than the originality requirement for other works; and (2) the key inquiry is whether there is sufficient nontrivial expressive variation in the derivative work to make it distinguishable from the underlying work in some meaningful way. This focus on the presence of nontrivial "distinguishable variation" adequately captures the concerns articulated in *Gracen* without unduly narrowing the copyrightability of derivative works. It is worth repeating that the copyright in a derivative work is thin, extending only to the incremental original expression contributed by the author of the derivative work. *See* 17 U.S.C. § 103(b).

As applied to photographs, we have already explained that the original expression in a photograph generally subsists in its rendition of the subject matter. If the photographer's rendition of a copyrighted work varies enough from the underlying work to enable the photograph to be distinguished from the underlying work (aside from the obvious shift from three dimensions to two, *see supra* n.3), then the photograph contains sufficient incremental originality to qualify for copyright. Schrock's photos of the "Thomas & Friends" toys are highly accurate product photos but contain

minimally sufficient variation in angle, perspective, lighting, and dimension to be distinguishable from the underlying works; they are not "slavish copies." Accordingly, the photos qualify for the limited derivative-work copyright provided by § 103(b).[5] *See*

_____

[5] Learning Curve and HIT argue in the alternative that Schrock's photos fall within the *scènes à faire* or merger doctrines and therefore are not copyrightable. The doctrine of *scènes à faire* (French for "scenes for action") prohibits copyright protection in elements or themes that are "so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Bucklew,* 329 F.3d at 929; *see also Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 616 (7th Cir. 1982) (mazes and tunnels in Atari's PAC-MAN video game are common to this class of video games and are therefore *scènes à faire* and not copyrightable). The defendants' argument seems to be that because images of its "Thomas & Friends" toys will be common to *all* product photos of the toys, *no* product photos can be copyrighted. If this were true, then no derivative work would be copyrightable; by definition, derivative works incorporate the underlying work in some way. In any event, as we explained in *Bucklew,*

> [e]very expressive work can be decomposed into elements not themselves copyrightable—the cars in a car chase, the kiss in a love scene, the dive bombers in a movie about Pearl Harbor, or for that matter the letters of the alphabet in any written work. The presence of such [common] elements obviously does not forfeit copyright protection of the work as a whole, but infringement cannot be found

(continued...)

*SHL Imaging*, 117 F. Supp. 2d at 311 (holding that copyright protection in product-accurate photographs was "thin"); *see also Rockford Map Publishers, Inc. v. Directory Serv. Co. of Colo., Inc.*, 768 F.2d 145, 148 (7th Cir. 1985) ("Perhaps the smaller the effort the smaller the contribution; if so, the copyright simply bestows fewer rights."). However narrow that copyright might be, it at least protects against the kind of outright copying that occurred here.

---

[5] (...continued)

> on the basis of such elements alone; it is the combination of elements, or particular novel twists given to them, that supply the minimal originality required for copyright protection."

329 F.3d at 929. Schrock's contribution of the photographic elements of lighting, angle, perspective, and the like supply the "minimal originality" required for copyright in the photos.

Learning Curve and HIT also invoke the doctrine of merger, which is premised on the principle that ideas cannot be copyrighted. *See JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 917 (7th Cir. 2007) (noting the "fundamental tenet of copyright law that the idea is not protected, but the original expression of the idea is"). Copyright cannot attach when the idea and the expression "merge." The defendants argue that because Schrock's photos are "straightforward" product photos, he has done nothing more than "express" the "idea" of "basic product photography." The defendants do not explain how a product photo—even one that is "straightforward" or "basic"—qualifies as an uncopyrightable "idea." In any event, this argument essentially advocates a categorical rule that all accurate product photos are uncopyrightable. We are unwilling to establish such a rule.

### C. Authorization and Derivative Works

To be copyrightable, a derivative work must not be infringing. *See* 17 U.S.C. § 103(a); *see also Pickett,* 207 F.3d at 405-06; *Gracen,* 698 F.2d at 302. The owner of the copyright in the underlying work has the exclusive right to "prepare derivative works based upon the copyrighted work," 17 U.S.C. § 106(2), and "it is a copyright infringement to make or sell a derivative work without a license from the owner of the copyright on the work from which the derivative work is derived," *Bucklew,* 329 F.3d at 930. This means the author of a derivative work must have permission to make the work from the owner of the copyright in the underlying work; *Gracen* suggested, however, that the author of a derivative work must *also* have permission to *copyright* it. 698 F.2d at 303-04 ("[T]he question is not whether Miss Gracen was licensed to make a derivative work but whether she was also licensed to exhibit [her] painting and to copyright it. . . . Even if [Gracen] was authorized to exhibit her derivative works, she may not have been authorized to copyright them."). The district court relied on this language from *Gracen* to conclude that Schrock has no copyright in his photos because he was not authorized by Learning Curve to copyright them. This was error.

First, *Gracen*'s language presupposing a permission-to-copyright requirement was dicta; the case was actually decided on nonoriginality grounds. *Id.* at 305. More importantly, the dicta was mistaken; there is nothing in the Copyright Act requiring the author of a derivative

work to obtain permission to copyright his work from the owner of the copyright in the underlying work. To the contrary, the Act provides that copyright in a derivative work, like copyright in any other work, arises by operation of law once the author's original expression is fixed in a tangible medium. "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), and "[t]he subject matter of copyright . . . includes . . . derivative works," *id.* § 103(a). "Copyright in a work protected under this title vests initially in the author or authors of the work."[6] *Id.* § 201(a); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The creator of the [intellectual] property is the owner . . . ."). While the author of an original work "may obtain a certificate of copyright, which is '*prima facie* evidence' of its validity," *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007), "copyright protection begins at the moment of creation of 'original works of authorship,'" *id*. at 914. This principle applies with equal force to derivative works.

---

[6] An exception is a "work made for hire," defined in 17 U.S.C. § 101 as "a work prepared by an employee within the scope of his or her employment" or "a work specially ordered or commissioned" for inclusion in certain categories of intellectual property as specified in subsection (2) of the definition. Ownership of the copyright in a work made for hire vests in "the employer or other person for whom the work was prepared." *Id.* § 201(b); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992). The defendants do not argue that Schrock's photos qualify as works made for hire.

The leading treatise on copyright law confirms this basic understanding. "[T]he right to claim copyright in a noninfringing derivative work arises by operation of law, not through authority from the copyright owner of the underlying work."[7] 1 NIMMER ON COPYRIGHT § 3.06, at 3-34.34. We have cited Nimmer with approval on this point. *See Liu*, 302 F.3d at 755. As we noted in *Liu*, however, there is an important proviso explained in the treatise: "[I]f the pertinent agreement between the parties affirmatively bars the licensee from obtaining copyright protection even in a licensed derivative work, that contractual provision would appear to govern.'" 1 NIMMER ON COPYRIGHT § 3.06, at 3-34.34; *see also Liu*, 302 F.3d at 755.

On this point *Liu* is instructive. Price Waterhouse LLP owned the copyright to a computer-software program, and Yang, an employee, was asked to help recruit a Chinese computer programmer to increase the speed of the program. *Liu*, 302 F.3d at 751. Yang became concerned that if the Chinese programmer was successful, Price Waterhouse might exclude her from future Chinese ventures. To allay these concerns, Price Waterhouse entered into a series of letter agreements with Yang specifying a payment schedule for benchmark improve-

---

[7] The Nimmer treatise notes the anomaly in *Gracen*: "[*Gracen*] would appear to be incorrect in suggesting that copyright in any derivative work may not be claimed, even if the making of such work had been licensed, unless such license affirmatively included the right to claim copyright in the derivative work." 1 NIMMER ON COPYRIGHT § 3.06, at 3-34.34 n.28.

ments in the program and promising to appoint her to head additional projects in China if she and the Chinese programmer met the benchmarks. The agreements also provided, however, that Price Waterhouse would own the intellectual-property rights to the improved software. *Id.* at 751-52. The Chinese programmer achieved the desired increase in speed, but a dispute arose over Yang's payment and Yang refused to give Price Waterhouse the source code to the improved software. She then induced the Chinese programmer to assign any copyright in the improved program to Liu, her daughter, and registered the copyright in Liu's name. *Id.* at 752.

In the meantime, Price Waterhouse turned to another consultant for assistance in improving its software program. The new consultant successfully increased the speed of the program, and Price Waterhouse incorporated these improvements into its software. Liu then sued Price Waterhouse for copyright infringement. Price Waterhouse counterclaimed for infringement and filed a third-party complaint against Yang for contributory infringement and various state-law claims sounding in misappropriation. For her part, Yang asserted a breach-of-contract claim against Price Waterhouse for nonpayment on the letter agreements. A jury found for Price Waterhouse on the copyright-infringement claims and for Yang on the breach-of-contract claim. *Id.* at 753.

We affirmed, explaining that because the owner of a copyrighted work has the exclusive right to control the preparation of derivative works, the owner could limit

the derivative-work author's intellectual-property rights in the contract, license, or agreement that authorized the production of the derivative work. *Id.* at 755. Citing Nimmer, we noted that although the right to claim copyright in a derivative work arises by operation of law—not by permission of the underlying copyright owner—the parties may alter this general rule by agreement. *Id.* ("While the Copyright Act makes authors of derivative works the presumptive owners of copyright rights in their contribution, it also allows parties to adjust those rights by contract." (quotation marks omitted)). We affirmed the jury's verdict finding that the parties had agreed that Price Waterhouse would own the copyright in any derivative program. *Id.*

In this case, the evidence submitted with the summary-judgment motion does not establish as a matter of law that the parties adjusted Schrock's rights by contract; as in *Liu,* it may be a jury question. We say "may" because further development of the record might resolve the remaining liability questions as a matter of law. It is undisputed that Schrock was authorized to photograph the "Thomas & Friends" toys, and as the creator of the photos, Schrock's copyright arose by operation of law.[8]

---

[8] Schrock argued in the alternative that if permission to copyright his photos was required, application of agency principles entitled him to copyright protection. That is, he argued that Learning Curve, as HIT's licensee, had apparent authority to permit him to copyright his photos, and that it
(continued...)

We cannot tell, however, whether the parties altered this default rule in their agreements. We note that HIT apparently attempted to do so, at least vis-à-vis Learning Curve; it claims that its licensing agreement with Learning Curve expressly retained the intellectual-property rights in all works that were based upon its copyrights. HIT also claims that the licensing agreement prohibited Learning Curve from granting any third parties copyright protection in derivative works based on HIT's copyright. As we have noted, however, the licensing agreement is not in the record. Although HIT's summary-judgment submission included an affidavit of its vice-president of licensing describing the agreement, the best evidence of the terms of an agreement is, of course, the agreement itself. *See* FED. R. EVID. 1002.

The terms of the agreement between Learning Curve and Schrock are even less clear. Whether Learning Curve, as HIT's licensee, contractually limited Schrock's right

---

[8] (...continued)
did so—albeit not affirmatively but by its silence on the subject. *Gracen* suggests that application of agency law, including the doctrine of apparent authority, is appropriate in this context. 698 F.2d at 303-04. We need not address this alternative argument, however. As we have explained, because Schrock was authorized to make the photos, his copyright arose by operation of law and did not require authority to copyright from the owner or licensee of the copyright in the underlying works—whether actual *or* apparent.

to copyright his photos is unknown; its failure to develop the record on this point, however, suggests that it did not. From what we can tell, the agreement between Learning Curve and Schrock appears to consist of a series of oral agreements followed by invoices for completed photography work. If Learning Curve was required under its licensing agreement with HIT to protect HIT's intellectual-property rights in connection with its retention of Schrock's photography services, it apparently failed to do so. Learning Curve argues in the alternative that Schrock granted it an unlimited license to use his photos, but on this issue the record is also ambiguous. We leave it to the district court to sort out, consistent with this opinion, whether the evidence requires a trial to determine liability among the parties.

Accordingly, for all the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

Circled Photo by Dan Schrock Photography
Rescue Hospital                    2002



Circled Photo by Dan Schrock Photography
Rescue Hospital                    2002

